

**SIGNED this 11th day of September, 2009.**

_Craig A. Gargotta_

———————————————————
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

———————————————————————————————

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| SMTC MANUFACTURING OF TEXAS, | § | CASE NO. 04-16354-CAG |
| | § | |
| Debtor | § | CHAPTER 7 |

| | | |
|---|---|---|
| | § | |
| RONALD E. INGALLS, CHAPTER 7 | § | |
| TRUSTEE, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| SMTC CORPORATION, | § | ADVERSARY NO 06-1283 |
| SMTC de CHIHUAHUA S.A. de C.V., | § | |
| SMTC MEX HOLDINGS, INC., | § | |
| SMTC MANUFACTURING CORP. | § | |
| OF NORTH CAROLINA, SMTC | § | |
| MANUFACTURING CORPORATION OF | § | |
| CANADA, and HTM HOLDINGS, INC., | § | |
| Defendants. | § | |

### MEMORANDUM OPINION

The above referenced adversary proceeding came before this Court for trial the weeks of March 23 and March 30, 2009. After trial, the Court took the matter under advisement. The Court

also requested certain post-trial briefing from the parties, which has been submitted and reviewed. This is a core proceeding. This Court has jurisdiction to enter a final order with regard to matters presently under submission pursuant to 28 U.S.C. §1334(a), (b) and (d), 28 U.S.C. §157(a) and (b), 28 U.S.C. § 151 and the Standing Order of Reference of Bankruptcy Matters entered by the United States District Court for the Western District of Texas. This Memorandum Opinion is being issued as written findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.

# CONTENTS

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE WITNESSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

THE TRUSTEE'S CLAIMS AND THE PARTIES' ALLEGATIONS . . . . . . . . . . . . . . . . . . . 4

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

The Facts Regarding the Joint Cash-Management System
    and the Zero Balance Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        The Joint Cash-Management System Prior to March 2002 . . . . . . . . . . . . . . . . . . . 9

        The Joint Cash-Management System from March 2002 Onward . . . . . . . . . . . . . . . 10

The Facts Regarding Claim Category 1: The Intercompany Transfers . . . . . . . . . . . . . . . 11

The Facts Regarding Claim Category 2: The Expense Reallocations . . . . . . . . . . . . . . . . 14

The Facts Regarding Claim Category 3: The Net Balance Transfer . . . . . . . . . . . . . . . . . 15

The Facts Regarding Claim Category 4: The Fixed Assets Transfers . . . . . . . . . . . . . . . . 15

The Facts Regarding the Decision to Shut Down . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

The Facts Regarding Corporate Control and Corporate Formalities . . . . . . . . . . . . . . . . . 21

CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Preliminary Issue I: Whether the Trustee's Expert Testimony Was Sufficient . . . . . . . . . . . . 25

Preliminary Issue II: Whether the Lien Securing the Lehman Loan Fully
    Encumbered All of the Debtor's Property, So That There Was No "Asset"
    That Could Have Been the Subject of a "Transfer" . . . . . . . . . . . . . . . . . . . . . . . . . 25

        Preliminary Sub-Issue IIA: Whether the Definition of "Asset" under TUFTA,
            as Interpreted in *Mullins*, Means That Even When There Is Equity
            in the Collateral Considered as a Whole, There Is No "Transfer" of an "Asset"
            So Long as the Value of the Item(s) of Property Conveyed Is Less Than
            the Entire Secured Debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        Preliminary Sub-Issue IIB: Whether the Debtor Should Be Considered
            Liable for the Full Amount of the Lehman Loan Balance, or for Only
            Some Lesser Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

            Whether the Debtor's Liability Should be Considered "Contingent" . . . . . . . . 30

            Whether the Trustee Proved the Debtor's Liability
                Should Be Discounted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Preliminary Sub-Issue IIC: Whether the Lehman Loan Balance Exceeded
the Value of All the Debtor's Property at the Time of the Conveyances . . . . . . . 39

Preliminary Issue III: Insolvency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

The Trustee's Claims for Transfers
Made with Actual Intent to Hinder, Delay or Defraud . . . . . . . . . . . . . . . . . . . . . . . . 50

Direct Evidence of Actual Intent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

The Early Wind-Down Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

The Post-Default Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Circumstantial Evidence of Actual Intent: Badges of Fraud
on Claim Category 1: The Intercompany Transfers . . . . . . . . . . . . . . . . . . . . . . 58

Badge of Fraud 1: Transfers made to insiders or obligations
to insiders incurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Badge of Fraud 2: The debtor retained possession or control
of the property transferred after the transfer . . . . . . . . . . . . . . . . . . . . 58

Badge of Fraud 3: The transfer or obligation was concealed . . . . . . . . . . . . . . . . 58

Badge of Fraud 4: Before the transfer was made or obligation
was incurred, the debtor had been threatened with suit . . . . . . . . . . . . . 58

Badge of Fraud 5: The transfer was of substantially all the debtor's assets . . . . 59

Badge of Fraud 6: The debtor absconded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Badge of Fraud 7: The debtor removed or concealed assets . . . . . . . . . . . . . . . . 59

Badge of Fraud 8: The value of the consideration received by the debtor
was reasonably equivalent to the value of the assets transferred or
the amount of the obligation incurred . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Badge of Fraud 9: The debtor was insolvent or became insolvent shortly
after the transfer was made or the obligation was incurred . . . . . . . . . . 62

Badge of Fraud 10: The transfer occurred or the obligation was incurred
shortly before or shortly after a substantial debt was incurred . . . . . . . . 62

Badge of Fraud 11: The debtor transferred the essential assets of the business
to a lienor who transferred the assets to an insider of the debtor . . . . . . 62

Summary: Badges of Fraud on the Intercompany Transfers . . . . . . . . . . . . . . . . . . 62

Circumstantial Evidence of Actual Intent: Badges of Fraud
on Claim Category 2: The Expense Reallocations . . . . . . . . . . . . . . . . . . . . . . . 62

Badge of Fraud 1: Transfers made to insiders or obligations
to insiders incurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Badge of Fraud 2: The debtor retained possession or control of the property
transferred after the transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Badge of Fraud 3: The transfer or obligation was concealed . . . . . . . . . . . . . . . 63

Badge of Fraud 4: Before the transfer was made or obligation was incurred,
the debtor had been threatened with suit . . . . . . . . . . . . . . . . . . . . . . . . 63

Badge of Fraud 5: The transfer was of substantially all the debtor's assets . . . . 63

Badge of Fraud 6: The debtor absconded . . . . . . . . . . . . . . . . . . . . . . . . . . 63

Badge of Fraud 7: The debtor removed or concealed assets . . . . . . . . . . . . . . 64

Badge of Fraud 8: The value of the consideration received by the debtor was
reasonably equivalent to the value of the assets transferred
or the amount of the obligation incurred . . . . . . . . . . . . . . . . . . . . . . . . 64

Badge of Fraud 9: The debtor was insolvent or became insolvent shortly
after the transfer was made or the obligation was incurred . . . . . . . . . . 65

Badge of Fraud 10: The transfer occurred or the obligation was incurred
shortly before or shortly after a substantial debt was incurred . . . . . . . . 65

Badge of Fraud 11: The debtor transferred the essential assets of the business
to a lienor who transferred the assets to an insider of the debtor . . . . . . . 66

Summary: Badges of Fraud on the Expense Reallocations . . . . . . . . . . . . . . . 66

Circumstantial Evidence of Actual Intent: Badges of Fraud
on Claim Category 3: The Net Balance Transfers . . . . . . . . . . . . . . . . . . . . . . . 66

Badge of Fraud 1: Transfers made to insiders or obligations
to insiders incurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Badge of Fraud 2: The debtor retained possession or control of the property
transferred after the transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Badge of Fraud 3: The transfer or obligation was concealed . . . . . . . . . . . . . . 67

Badge of Fraud 4: Before the transfer was made or obligation was incurred,
the debtor had been sued or threatened with suit . . . . . . . . . . . . . . . . . 67

Badges of Fraud 5: The transfer was of substantially all the debtor's assets . . . . 68

Badge of Fraud 6: The debtor absconded . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Badge of Fraud 7: The debtor removed or concealed assets . . . . . . . . . . . . . . 68

Badge of Fraud 8: The value of the consideration received by the debtor
was reasonably equivalent to the value of the asset transferred
or the amount of the obligation incurred . . . . . . . . . . . . . . . . . . . . . . . . 68

Badge of Fraud 9: The debtor was insolvent or became insolvent shortly after
the transfer occurred or the obligation was incurred . . . . . . . . . . . . . . . 70

Badge of Fraud 10: The transfer occurred or the obligation was incurred
shortly before or shortly after a substantial debt was incurred . . . . . . . . 70

Badge of Fraud 11: The debtor transferred the essential assets of the business
to a lienor who transferred the assets to an insider of the debtor . . . . . . . 71

Summary of Badges of Fraud on the Net Balance Transfer . . . . . . . . . . . . . . . . . 71

Circumstantial Evidence of Actual Intent: Badges of Fraud
on Claim Category 4: The Fixed Assets Transfers  . . . . . . . . . . . . . . . . . . . . . . 71

Badge of Fraud 1: Transfers made to insiders or obligations
to insiders incurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Badge of Fraud 2: The debtor retained possession or control of the property
transferred after the transfer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

Badge of Fraud 3: The transfer or obligation was concealed . . . . . . . . . . . . . . . . 71

Badge of Fraud 4: Before the transfer was made or obligation was incurred,
the debtor had been threatened with suit . . . . . . . . . . . . . . . . . . . . . . . . . 72

Badge of Fraud 5: The transfer was of substantially all the debtor's assets  . . . . 72

Badge of Fraud 6: The debtor absconded  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Badge of Fraud 7: The debtor removed or concealed assets  . . . . . . . . . . . . . . . 73

Badge of Fraud 8: The value of the consideration received by the Debtor
was reasonably equivalent to the value of the assets transferred
or the amount of the obligation incurred  . . . . . . . . . . . . . . . . . . . . . . . . . 73

Badge of Fraud 9: The debtor was insolvent or became insolvent
shortly after the transfer occurred or the obligation was incurred  . . . . . . 74

Badge of Fraud 10: The transfer occurred shortly after a substantial debt
was incurred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Badge of Fraud 11: The debtor transferred the essential assets of the business
to a lienor who transferred the assets to an insider of the debtor . . . . . . . 74

Summary of Badges of Fraud on Fixed Assets Transfers  . . . . . . . . . . . . . . . . . 74

Conclusions Regarding the Trustee's Claims for Transfers Made with Actual Intent
to Hinder, Delay or Defraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

The Trustee's Claims for Transfers Made with Constructive Fraud  . . . . . . . . . . . . . . . . . . . . . . 75

Constructive Fraud Elements as to Claim Category 1: The Intercompany Transfers  . . . 75

Constructive Fraud Elements as to Claim Category 2: The Expense Reallocations  . . . . 77

Constructive Fraud Elements as to Claim Category 3: The Net Balance Transfer  . . . . . 77

Constructive Fraud Elements as to Claim Category 4: The Fixed Assets Transfers  . . . . 78

The Trustee's Veil Piercing Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

The Trustee's Veil-Piercing Claim Based on Alter Ego  . . . . . . . . . . . . . . . . . . . . . . . . 80

The Trustee's Veil-Piercing Claim Based on Sham to Perpetrate a Fraud  . . . . . . . . . . 84

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

vi

## PROCEDURAL HISTORY

The Trustee initiated this adversary by filing his Original Complaint on December 13, 2004. The Trustee filed his Fourth Amended Complaint on October 27, 2008. Rulings on the Defendants' 12(b)(6) and summary judgment motions limited the claims remaining for trial. Specifically, the Court dismissed the Trustee's single enterprise and conspiracy theory causes of actions and limited the Trustee's veil-piercing liability, if any, to SMTC Corporation ("SMTC Corporate"), HTM Holdings, Inc. ("HTM"), and SMTC Manufacturing Corporation of Canada ("SMTC Canada").

Thus, as claims remaining for trial, the Plaintiff/Trustee on behalf of the estate of the Debtor, SMTC Manufacturing Corporation of Texas ("SMTC Texas") seeks to avoid pursuant to 11 U.S.C. § 544(b) and §§ 24.005(a)(1), (2) and 24.006(a) of the Texas Uniform Fraudulent Transfer Act ("TUFTA") certain allegedly fraudulent transfers to certain Defendants that occurred from January 2002 through December 2003 and with an alleged value in excess of $80 million dollars. Additionally, the Plaintiff/Trustee requests relief under Texas law against certain Defendants based on corporate veil-piercing theories of alter ego and sham to perpetrate a fraud.

The case was tried over nine days. At the close of the Trustee's evidence, the Defendants moved under Rule 52(c) for a judgment as a matter of law on the TUFTA claims, arguing that there were no "transfers" of any "assets" as defined in that statute. The Court denied that motion, for reasons stated on the record.

At the close of all the evidence, Defendants once again made a motion under Rule 52(c) (the "Rule 52(c) Motion"), asserting a number of grounds including those urged in their prior motion that had been denied. The post-trial motion was carried with the Court's consideration after trial of the merits of the action, and was taken under advisement.

## THE PARTIES

The Plaintiff in this action is Ron Ingalls, the Chapter 7 Trustee ("Trustee") of the Debtor. The Defendants in this action are:

1. SMTC Corporate, a corporation organized under the laws of Delaware and is the parent company of all the SMTC corporations[1];

---

[1] In addition to the named Defendants, there were other operating subsidiaries in California, Wisconsin, Massachusetts and Colorado (all together hereinafter referred to as the "SMTC entities").

2. HTM, a corporation organized under the laws of Delaware and the holding company for several subsidiaries of the SMTC family and a wholly-owned subsidiary of SMTC Corporate;

3. SMTC Manufacturing Corporation of North Carolina ("SMTC Charlotte"), a wholly-owned subsidiary of HTM;

4. SMTC Mex Holdings, Inc. ("SMTC Mex"), a corporation organized under the laws of Delaware and is a wholly-owned subsidiary of HTM;

5. SMTC de Chihuahua, S.A. de C.V. ("SMTC Chihuahua"), a corporation organized under the laws of Mexico and is a wholly-owned subsidiary of SMTC Mex; and

6. SMTC Canada, a corporation organized under the laws of Canada and a wholly-owned subsidiary of SMTC Nova Scotia Company, which is a wholly-owned subsidiary of SMTC Corporate.

## THE WITNESSES

1. Ron Ingalls, the Chapter 7 Trustee and the Plaintiff;

2. Kirk Hartstein, the vice president and general manager of the Debtor from 1999 to 2002 and the vice-president of the Debtor from 2002 until its closing;

3. John Sommerville, the director of engineering and vice president of operations of the Debtor from June, 1999 to March, 2003;

4. Scott Kingery, a test engineer for the Debtor from 1999 to just prior to its closing;

5. Richard Winter, the vice-president and general manager for Debtor from 1996 to 1999;

6. Frank Skerlj, director of finance for SMTC Canada and the corporate representative for all the Defendants;

7. Julian Alexander, the expert hired by the Trustee, the owner of Accounting Economics Appraisal Group, a Certified Public Accountant, certified in financial forensics, and a certified fraud examiner;

8. Margaret Reinhart, an expert originally hired by the Trustee[2] and a shareholder in Forensic Strategic Solutions;

---

[2] Ms. Reinhart was disqualified from testifying as an expert witness at the trial because she had been employed on a contingency basis, and the Texas disciplinary requirements governing accountants prohibit an expert from being retained under compensation arrangement. Ms. Reinhart had originally reviewed certain financial data of the Debtor and Defendants and had compiled certain information regarding the data reviewed. The Court allowed her to testify not as an expert, but as a summary witness regarding certain exhibits she prepared for trial and which were admitted at trial.

9. Kell Mercer, the attorney who prepared the proof of claim for Flextronics International, Inc.;

10. Cliff Ernst, corporate lawyer in Austin, Texas, who prepared the initial incorporation documents of the Debtor and handled various other corporate matters;

11. Mario Ochoa, a corporate representative of Flextronics International, Inc., whose video deposition testimony was admitted at trial;

12. Alma Carbajal Velasquez, currently the controller of SMTC Chihuahua/SMTC Mex, who held positions with that company as accounting supervisor prior to 2000 and accounting manager between 2000 and 2002;

13. Terry Hart, who testified by deposition and was the former manufacturing manager of the Debtor, a position which required him to work with the accounting department at SMTC Chihuahua (or Mex) in connection with exporting products from SMTC Chihuahua to SMTC Texas. Defendants introduced Mr. Hart's testimony by deposition;

14. Tom Rossi, a former employee of SMTC Chihuahua and/or SMTC Mex, whose testimony was offered by the Defendants by video deposition;

15. Kristin Markland, a former accounting manager for Debtor, who prior to that position had worked as an accounts payable supervisor and clerk as well as an administrative assistant and receptionist for the Debtor;

16. B.J. Desai, the former director of engineering with SMTC Corporate, whose primary responsibility was accountability for all of the equipment held by all of SMTC Corporate's subsidiaries;

17. Jane Todd, the current president and CFO of SMTC Corporate and also the secretary and treasurer for most of the subsidiaries; and

18. Otto Wheeler, a Certified Public Accountant who owns Wheeler and Company and who testified as Defendants' expert witness.

## BACKGROUND FACTS

Two *Austin American Statesman* articles were written in mid-2002 regarding the economic difficulties associated with computer component manufacturers. These articles directly address problems experienced not only by SMTC Texas, but also the Debtor's lessor, Flextronics International, Inc. ("Flextronics"):

3

**SMTC will lay off about 1000; U.S. Foodservice also plans to pare jobs**

Weak demand from computer buyers and a grinding price war among computer makers continue to take a heavy toll on component manufacturers.

SMTC Corp., which makes motherboards for Dell Computer Corp. servers will lay off about half of the 200 workers at its North Austin plant in August. Like the computer makers, suppliers such as Toronto-based SMTC have been closing facilities and cutting jobs in an effort to return to profitability. In the first quarter, SMTC closed a plant in Cork, Ireland.

SMTC is moving motherboard production to its plant in Chihuahua, Mexico, said Kirk Hartstein, general manager of the Austin plant. As computer prices continue to fall, manufacturers have increasingly farmed out work to plants in Mexico, where wages are much lower than in the United States.

SMTC is just the latest contract manufacturer in Central Texas to cut jobs in the wake of the slowdown in technology spending. Last month, Flextronics, Inc. said it will close its New Braunfels plant in August, eliminating 780 jobs, according to a filing with the Texas Workforce Commission.

Exh. D-31, *Austin American Statesman* Online Archives dated June 6, 2002 by John Pletz.

**Plant changes helped Dell avoid Mexico move**

The dramatic productivity·improvements achieved at Dell Computer Corp.'s Parmer North 2 plant, in part, helped keep the production of corporate desktop computers in Austin instead of Mexico.
. . . .
Although Dell couldn't figure out a way to make Mexico work out logistically for its own finished PCs, components are another story. Many of the computers coming down the conveyors at Parmer join up with monitors bearing the Dell logo that are assembled in Mexico.
. . .
Several Dell suppliers have moved to Mexico because of their ever shrinking profits in the computer-industry food chain.

SMTC Corp., which makes motherboards for Dell, laid off 100 workers in Austin recently and moved production to Chihuahua, in central northern Mexico. Flextronics, Inc., which made metal computer housings for Dell, closed its plants in New Braunfels, laying off the last of about 1,000 workers this month and moved production offshore.

Exh. D-32, *Austin American Statesman* Online Archives dated August 26, 2002 by John Pletz

It is within the context of this economic downturn that the decision to shut down the Debtor and later to file bankruptcy, ultimately leading to the filing of this adversary proceeding.


## THE TRUSTEE'S CLAIMS AND THE PARTIES' ALLEGATIONS

The Trustee brought suit to avoid allegedly fraudulent pre-petition transfers of cash and fixed assets made by the Debtor to certain Defendants from January 2, 2002 through December 2003. The allegedly more than $80 million of fraudulent transfers can be divided into four categories:

1) transfers of cash, allegedly totaling approximately $37 million, to SMTC Mex and SMTC Charlotte between February 2002 and February 2003 (the "Intercompany Transfers"),

2) the reallocations to the Debtor from September 2002 through January of 2003 of certain costs totaling $1.959 million, previously borne by SMTC Corporate (the "Expense Reallocations"),

3) cash transfers between January 2002 and December 2003 between SMTC Texas's bank accounts and the HTM consolidated bank accounts, which the Trustee and his expert netted out to arrive at a net transfer of approximately $41.1 million in favor of HTM (the "Net Balance Transfer"), and

4) transfers of SMTC Texas's fixed assets to affiliates in March and April of 2003 (the "Fixed Assets Transfers").

Finally, the Trustee also asserts a claim alleging that certain of the Defendants should be responsible for the debts of the Debtor under various veil-piercing theories.

The Trustee asserts that SMTC Corporate, SMTC Canada and HTM orchestrated, planned, and arranged to bankrupt the Debtor and transfer all the cash, capital, and other property from the Debtor to certain affiliates at the Debtor's expense to avoid the financially cumbersome lease obligation the Debtor owed to Flextronics. The Trustee claims that as part of the plan to siphon cash and other assets from the Debtor to certain affiliates, SMTC Corporate decided to disengage the Debtor from its largest and most lucrative customer, Dell. Then, once it became known that Debtor had disengaged from Dell, other customers left the company. By mid-2002, the Debtor, having lost almost its entire customer base, commenced lay-offs and initiated the shutdown of its operating facility and such activity defrauded not only Flextronics, the Debtor's largest creditor, but other creditors as well.

The Defendants dispute the Trustee's allegations. The Defendants allege that no transfers occurred because all of the Debtor's assets were fully encumbered by a lien to its lender and were therefore beyond the reach of TUFTA. Defendants further allege that the Debtor's bankruptcy was the result of economic and market conditions prevailing in Austin, Texas, and in the technology sector at that time. Defendants assert the Debtor could not continue to service the Dell account without the aid of its sister company in Mexico and ultimately not at all due to the continuous pricing pressure put on it by Dell. Furthermore, Defendants assert the Debtor did not have enough income to pay its debts and its lease so it chose to pay creditors other than Flextronics. With the exception of Flextronics, most obligations incurred by the Debtor prior to closing its doors in the spring of 2003 were paid. That is reflected by the low number of proofs of claim filed in this case, all but one of which are claims that did not arise until after the Debtor closed its doors in May of 2003. Defendants assert that for every transfer by the Debtor,

5

reasonably equivalent value was provided to the Debtor. Defendants also assert that any liability of a Defendant for avoidance is offset by Defendants' right of setoff and recoupment.

## FINDINGS OF FACT

SMTC Texas was engaged in the business of manufacturing computer components in Austin, Texas. The Debtor was at all relevant times a wholly-owned subsidiary of HTM which is itself a wholly-owned subsidiary of SMTC Corporate. The Debtor is a corporation duly organized under the laws of Texas. P-120, 121. The Debtor is one of several subsidiaries owned by HTM and was considered an operating subsidiary, that is, its purpose was to manufacture electronic component parts for computer and other technology related companies. The Debtor was one of several subsidiaries under the SMTC umbrella. The SMTC entities operated globally with companies in Canada, the United States, Mexico, and Ireland.

The Debtor's operations consisted of a single manufacturing facility in Austin, Texas. The Debtor leased this facility from Flextronics pursuant to a lease agreement dated September 1, 2001 (the "Lease"). The Lease was a ten-year lease to which the Debtor was committed through September 2011. The Debtor had initially commenced operations at another location in 1996. It also owned property on Bratton Lane in Austin, Texas but did not use the property in its operations. As its operations expanded in 2000, it was necessary for the Debtor to find additional space, resulting in the Lease with Flextronics.

The SMTC entities financed their operations collectively, as co-debtors and co-guarantors. On or about July 27, 2000, SMTC Corporate, HTM, SMTC Canada and several wholly-owned subsidiaries, including the Debtor, executed a restated and amended credit and collateral agreement ("Lehman Loan Agreement") with several banks and financial institutions, the primary lenders being Lehman Commercial Paper, Inc. ("Lehman") and General Electric Capital Corporation (collectively the "Lenders").

The Lehman Loan Agreement consists of two documents (1) the Amended and Restated Credit and Guarantee Agreement ("Credit Agreement"), Exh. D-107, and (2) the Amended and Restated Guarantee and Collateral Agreement ("Guarantee Agreement"), Exh. D-108.

Pursuant to the Credit Agreement and Guarantee Agreement, the Lenders extended credit and granted loans ("Lehman Loan") for the general corporate purposes of HTM and its subsidiaries. SMTC Corporate and several of HTM's subsidiaries, including the Debtor, were

6

parties to and guaranteed the Lehman Loan.  The Debtor absolutely and unconditionally guaranteed the Lehman Loan pursuant to the Guarantee Agreement.

All of Debtor's assets secured the Lehman Loan.  Exh. D-107 and D-108.  Lehman filed UCC-1 financing statements to perfect its security interest in the Debtor's assets.

The Debtor maintained a portion of the Lehman Loan debt on its books.  Although the Debtor was not the actual borrower on the Lehman Loan, it had guaranteed this debt and it used the borrowed funds in its daily operations.   During operations, the Debtor's individual use of the Lehman Loan fluctuated.  The monthly outstanding balances on the Lehman Loan for the all of the entities and the portion carried on the books of the Debtor are as follows:

| Date | Entire Balance of the Lehman Loan | Debtor's Proportionate Share of the Lehman Loan |
|---|---|---|
| January 2002 | $138,753,000.00 | $ 32,715,000.00 |
| February 2002 | 132,622,000.00 | 33,435,000.00 |
| March 2002 | 112,452,000.00 | 35,603,000.00 |
| April 2002 | 131,903,000.00 | 43,184,000.00 |
| May 2002 | 119,970,000.00 | 41,565,000.00 |
| June 2002 | 114,036,000.00 | 35,619,000.00 |
| July 2002 | 118,577,000.00 | 33,930,000.00 |
| August 2002 | 104,602,000.00 | 27,990,000.00 |
| Sept. 2002 | 90,163,000.00 | 25,129,000.00 |
| Oct. 2002 | 96,509,000.00 | 23,894,000.00 |
| Nov. 2002 | 92,307,000.00 | 21,544,000.00 |
| Dec. 2002 | 82,589,000.00 | 19,971,000.00 |
| January 2003 | 82,311,000.00 | 21,462,000.00 |
| February 2003 | 86,844,000.00 | 19,736,000.00 |
| March 2003 | 80,869,000.00 | 20,705,000.00 |
| April 2003 | 79,197,000.00 | 16,097,000.00 |
| May 2003 | 76,426,000.00 | 15,395,000.00 |
| June 2003 | 67,160,000.00 | 14,642,000.00 |
| July 2003 | 77,716,000.00 | 15,624,000.00 |

| Date | Entire Balance of the Lehman Loan | Debtor's Proportionate Share of the Lehman Loan |
|---|---|---|
| August 2003 | 77,592,000.00 | 15,757,000.00 |
| Sept. 2003 | 74,922,000.00 | 15,925,000.00 |
| Oct. 2003 | 72,717,000.00 | 16,218,000.00 |
| Nov. 2003 | 76,170,000.00 | 17,093,000.00 |
| Dec. 2003 | 70,077,000.00 | 17,327,000.00 |

Exh. D-24 ("Total Debt") and Line 342 on Exhs. D-1 and D-2; *see also* Defendants' Motion For Final Summary Judgment on Lien, Reasonably Equivalent Value, and Conspiracy Issues.

The monthly total value for the assets of the Debtor, according to its balance sheet, are as follows:

| Date | Value of the Debtor's Property |
|---|---|
| January 2002 | $ 50,297,000.00 |
| February 2002 | 53,451,000.00 |
| March 2002 | 57,373,000.00 |
| April 2002 | 63,950,000.00 |
| May 2002 | 66,108,000.00 |
| June 2002 | 60,349,000.00 |
| July 2002 | 59,539,000.00 |
| August 2002 | 50,837,000.00 |
| Sept. 2002 | 38,296,000.00 |
| Oct. 2002 | 32,768,000.00 |
| Nov. 2002 | 30,890,000.00 |
| Dec. 2002 | 22,129,000.00 |
| January 2003 | 22,232,000.00 |
| February 2003 | 20,614,000.00 |
| March 2003 | 14,916,000.00 |
| April 2003 | 7,513,000.00 |

| Date | Value of the Debtor's Property |
|---|---|
| May 2003 | 4,599,000.00 |
| June 2003 | 2,332,000.00 |
| July 2003 | 1,360,000.00 |
| August 2003 | 1,299,000.00 |
| Sept. 2003 | 1,181,000.00 |
| Oct. 2003 | 1,270,000.00 |
| Nov. 2003 | 1,206,000.00 |
| Dec. 2003 | 83,000.00 |

Line 324, Exhs. D-1 and D-2.

## The Facts Regarding the Joint Cash-Management System and the Zero Balance Accounts

The SMTC entities used a joint cash-management system that facilitated efficient financing from the Lehman Loan. This system operated in tiers or levels and was initially operated one way and then, at the request of Lehman, the arrangement changed.

### The Joint Cash-Management System Prior to March 2002

At the top tier of the banking arrangement is the Lehman Loan which funded all operations of the SMTC entities. The consolidated accounts (all other operating subsidiaries) constitute the second tier. Prior to March 2002, there was only one consolidated account: the HTM-maintained consolidated zero-balance account, Comerica Account Number xxxxxx5417 ("Consolidated ZBA Account"). The bottom tier constituted each of the subsidiaries' various bank accounts. Each subsidiary maintained a general bank account. The Debtor's general bank account was Comerica Account Number xxxxxx5375 ("Debtor General Bank Account"). Debtor's payroll bank account was Comerica Account Number xxxxxx5367 ("Debtor Payroll Bank Account").

When the Debtor would receive money from a customer, Debtor deposited it into the Debtor General Bank Account. When the Debtor needed to pay a bill, debt or any payable, funds

from the Lehman Loan would be deposited into the Consolidated ZBA Account and from there deposited into the Debtor General Bank Account. Funds needed for payroll were deposited into the Debtor Payroll Bank Account. Any other expenses were paid directly out of the Debtor General Bank Account.

At the end of the business day, whatever funds remained in Debtor General Bank Account (including deposits from customers and funds that had not been used to pay bills or other expenses) would be swept into the Consolidated ZBA Account, and then swept again and applied to the Lehman Loan.

### The Joint Cash-Management System from March 2002 Onward

The banking arrangements changed in March 2002. Additional disbursement accounts were established and a "lockbox" arrangement was instituted which prevented the SMTC entities from accessing the money deposited from customers into the general accounts.

A new consolidated disbursement bank account was created: Comerica Account Number xxxxxx5393 ("Consolidated Disbursement Account"). After March 2002, funds were no longer disbursed to the subsidiary accounts through the Consolidated ZBA Bank Account. Rather, funds needed by the operating subsidiaries would be deposited into the new Consolidated Disbursement Account. Likewise, new disbursement bank accounts were created for each individual subsidiary. Debtor's disbursement bank account was Comerica Account Number xxxxxxx4651 ("Debtor Disbursement Bank Account"). Instead of funds flowing from the Consolidated ZBA Bank Account to Debtor General Bank Account, they now flowed from the Consolidated Disbursement Bank Account to Debtor Disbursement Bank Account. The Debtor Payroll Bank Account remained in place. However, if funds were needed to pay payroll, they would now flow from the Debtor Disbursement Bank Account to the Debtor Payroll Bank Account.

The inflow of cash essentially remained the same as it was before March, 2002. That is, Debtor continued to receive deposits from customers into the Debtor General Bank Account. Just as before, at the end of each day these funds were swept into the Consolidated ZBA Account and then finally swept again and immediately applied to pay down the Lehman Loan.

What distinguished the arrangement in place after March 2002 is the Lender's control over deposits. Prior to March 2002, the subsidiaries would use the funds that were deposited into

their general accounts to pay vendors immediately, and only the net remaining in the account was swept up and applied to the Lehman Loan. After March 2002, a "lockbox" arrangement existed. Subsidiaries could no longer access any money deposited into their respective general accounts. As noted, economic pressures had been plaguing electronics manufacturers since 2001, and Lehman demanded more control.

HTM facilitated the operation of the consolidated accounts. The Debtor would make its funding requests for its expenses to SMTC Canada which would then authorize HTM to allow the Lehman Loan funds to be put into the Debtor's Disbursement Bank Account to pay expenses and then into the Debtor's Payroll Bank Account to make payroll. This was a routine, automatic efficient method of paying down the debt as well as reducing the amount of interest ultimately paid on the Lehman Loan.

### The Facts Regarding Claim Category 1: The Intercompany Transfers

All of the subsidiaries purchased and sold products from one another. With respect to the transfers in question, the Debtor purchased products from two of its subsidiaries, SMTC Charlotte and SMTC Mex. The alleged fraudulent transactions occurred between February 2002 and February 2003 and were a result of the need for the Debtor to outsource to Mexico to maintain competitiveness.

John Sommerville testified that SMTC Mex ramped up to offer customers a lower cost of production. Customers wanted to then shift production to Mexico to take advantage of lower manufacturing costs. In particular, Dell, the Debtor's main customer, was aggressive in its pricing strategies. As such, the Debtor, along with Dell, moved the Dell production to SMTC Mex to be profitable. Kirk Hartstein corroborated the testimony of Mr. Sommerville. Mr. Hartstein agreed that Dell was a continually difficult and demanding customer. SMTC Mex had the capacity to fulfill orders from the Debtor, and to remain competitive and profitable, the Debtor moved the manufacturing to Mexico.

Mr. Hartstein acknowledged that Dell's products were being built in Mexico and shipped to Texas. The labor in Mexico was $3.00 an hour and in Texas $19.00 an hour. Mexico would ship the requested goods to Texas. Dell would then pay Texas for the goods and Texas would place the goods in inventory for receipt by Dell. Texas received a markup for holding the inventory and servicing Dell in connection with the products made in Mexico. Mr. Hartstein

could not testify as to the exact mechanics of how the intercompany financial transactions were set up to handle these purchases from Mexico. He indicated this area was Mr. Giordano's responsibility. Mr. Giordano was the Debtor's on-site controller. Mr. Hartstein, however, acknowledged that the Mexico intercompany transactions existed.

Terry Hart, former manufacturing manager of the Debtor, also confirmed that the Debtor purchased product from SMTC Mex. Likewise, Kristin Markland, the Debtor's accounting manager at the time the intercompany transfers took place, also acknowledged that Debtor purchased product from Mexico as well as Charlotte because she processed the payables to SMTC Mex and SMTC Charlotte. Ms. Markland indicated that the Debtor would receive the product into inventory where it was recorded in an inventory program. She would then receive an invoice that she would match to the inventory. The transactions were documented with voided "dummy checks" payable to the subsidiary providing the product and by journal entries into the general ledger.

Tom Rossi, a former employee of SMTC Chihuahua also verified that product was made and shipped to the Debtor from Mexico. And, Alma Carbajal, the accounting manager at SMTC Mex also confirmed the Debtor's purchase of the product from SMTC Mex. Once SMTC Mex shipped the product from its warehouse, then SMTC Mex would invoice. She explained that an invoice would not be generated unless the goods were actually shipped. Ms. Carbajal also explained that SMTC Chihuahua actually manufactured the goods for SMTC Mex who sold the product to the Debtor. This was due to the maquiladora laws in effect in Mexico. She also acknowledged that the payments were by intercompany transaction and that when the Debtor purchased product from SMTC Mex and issued a dummy check, entries would be made on both SMTC Mex and the Debtor's 10800 general ledger account.

There was no controverting evidence in connection with this testimony nor any documentary evidence that the transactions were somehow falsified. In fact, Mr. Alexander, the Plaintiff's own expert, assumed in his analysis that value was received and that all the entries in the general ledger of SMTC Texas, which included the dummy checks, were valid. Transcript-Alexander (Mar. 27, 2009), p. 91 line 23 through p. 92 line 1. He further assumed for his report that the goods were received by the Debtor and that they were then sold based on the Debtor's financial reporting. Transcript-Alexander (March 27, 2009), p. 131 1.12 to 1.17. Mr. Alexander did question certain missing papers in connection with the shipping of the goods from Chihuahua

to El Paso; however, B.J. Desai explained that SMTC Chihuahua owned its own trucks and used them to deliver the products to El Paso for shipping.

The Debtor negotiated with Dell to move the manufacturing of its products to SMTC Mex because of lower costs of production. This was no secret. *See* Newspaper Articles, *supra*. Dell continued to use the Debtor as its primary SMTC contact. The Debtor would then place the purchase orders with SMTC Mex on behalf of Dell. SMTC Mex would have SMTC Chihuahua manufacture the product, invoice the Debtor, and deliver the goods to the Debtor. The Debtor would purchase the product from SMTC Mex and then turn around and sell it to Dell with a price markup. The Debtor invoiced Dell and Dell paid the Debtor. The Debtor at trial produced invoices, Mexican custom records, and freight documents to demonstrate the Debtor received the products from SMTC Mex in exchange for these payments. Exhs. D- 40 through D-55, D-68, D-69 and D-71.

There was little testimony on the Debtor's purchase of goods from Charlotte. On cross examination, Mr. Hartstein did acknowledge that the Debtor did purchase some goods and assembly time from the North Carolina subsidiary and that Charlotte would ship goods to the Debtor for it to then ship to its customers. Mrs. Markland also acknowledged these transactions. Mr. Hartstein acknowledged that this would again have been some type of intercompany transaction and that the Debtor's on-site controller, Mr. Giordiano, would handle the financial aspects of these transactions.

The Debtor, at trial, produced the original purchase orders, invoices, packing lists and shipping memos as evidence of the fact that products were received from SMTC Charlotte in exchange for these payments. Exhs. D-56 through D-68.

These transfers were all documented by voided intercompany checks instead of money actually changing hands. As such, these transfers between the Debtor and SMTC Mex and SMTC Charlotte were not reflected on the bank statements but only on the general accounting ledgers of the various subsidiaries. Rather than tie up funds and increase interest payments to Lehman, the SMTC entities simply recorded the entries on their respective ledgers, making the appropriate debit or credit to the respective subsidiaries' general ledger 10800 account. All of the intercompany payments for these transactions were then reconciled through the ZBA Consolidated Bank Account at the HTM level.

## The Facts Regarding Claim Category 2: The Expense Reallocations

Starting on September 29, 2002, SMTC Corporate reallocated certain costs to all of its subsidiaries for services rendered since 2000. Exh. D-2, lines 200 and 222, Exhs. D-233 through D-237. In the months preceding the September reallocations, there had been no allocation of costs in either the Corporate Reallocation category or the Sales and Marketing Reallocation category. Exh. D-2, lines 200 and 222. The Debtor's books reflect a Corporate Reallocation charge in September 2002 of approximately $750,000 and a Sales and Marketing Reallocation of $1.138 million. Exh. D-2, lines 200 and 222. The Debtor's Income Statement reflects Corporate Reallocation charges after September 2002 of $19,000 in October, $34,000 in November, and $36,000 in December of 2002, and $23,000 in January of 2003. Exh. D-2, line 200. For Sales and Marketing Reallocation, monthly charges were negative: <$5,000> in October, <$12,000> in November, and <$16,000> in December of 2002, and <$5,000> in January of 2003. Exh. D-2, line 222.

The SMTC Corporate services covered by these charges (the "Expense Reallocations") were sales and marketing consultation, training, centralized buying, and information technology services as well as other services incurred by the corporate office that benefitted each subsidiary and would have been incurred by the subsidiary individually had SMTC Corporate not provided these services. Originally, these costs had been incorrectly allocated solely to SMTC Corporate and needed to be allocated to the benefit of each subsidiary for tax purposes. The Expense Reallocations apparently corrected this problem.

Frank Skerlj and Kirk Hartstein both acknowledged that SMTC Corporate assisted the Debtor in many ways and that the Debtor received value for the services rendered by the parent and that all SMTC entities, not just the Debtor, were allocated the proper share of expenses. Mr. Kingery also indicated that SMTC Corporate provided leadership and a benefit to the Debtor. Mr. Kingery explained that Derek D'Andrade, an engineer at SMTC Corporate, would provide advice and suggestions to the Debtor regarding engineering issues on the lines. Richard Winter testified that SMTC Corporate negotiated more favorable financing terms for the entities and more favorable equipment terms and also helped in soliciting customers for the Debtor. Jane Todd and Frank Skerlj further explained that financial procedures and methodologies were in place to allocate these costs and that KPMG, a well-known accounting firm, had reviewed and approved these guidelines. Exh. D-239.

14

Other than perhaps the size of the charges reallocated, the Trustee produced no testimony or other evidence tending to show that the services were not actually rendered or that the costs allocated were not reasonably equivalent to the value of the services provided.

### The Facts Regarding Claim Category 3: The Net Balance Transfer

Between January 2002 and December 2003 an aggregate net of $41.1 million was swept from the Debtor's Comerica bank account to the consolidated bank accounts, meaning that the Debtor sent more cash to the Consolidated ZBA Bank Account handled by HTM than came back into the Debtor General Bank Account.

Mr. Alexander prepared a chart (the "Net Balance Chart") showing amounts flowing between the bank accounts of the Debtor and HTM. Exh. P-9. When asked, both Mr. Skerlj and Mr. Wheeler (Defendants' expert witness) agreed that the calculations reflected in Mr. Alexander's Net Balance Chart are entirely correct.

### The Facts Regarding Claim Category 4: The Fixed Assets Transfers

In March and April of 2003 as Debtor finalized its closing, its remaining fixed capital assets (except for the Bratton Lane land) were transferred to SMTC Chihuahua and SMTC Canada. As of March, 2003, the book value of SMTC Texas's fixed assets on its balance sheet was approximately $5,386,000.00. Exh. D-2, line 318. Of this amount, leasehold improvements accounted for approximately $2,730,000.00. These improvements were not transferred but abandoned back to Flextronics. The Bratton Lane land was also included in this calculation and had a value of $537,000.00.

Several witnesses testified as to what assets they thought remained in the building after the Debtor closed for business. Mr. Sommerville remembers some equipment on hand at closing but could not remember any specifics regarding disposition although he surmised that any leased equipment was returned to lessors and any Debtor-owned equipment was moved to another site, as it was standard upon closing to move equipment to an affiliate.

Mr. Kingery testified he purchased five testers for the Debtor and at the time they were purchased, three cost from $200,000 to $250,000, the gen rad tester cost between $400,000 and $450,000, and the probe tester cost $250,000. He could not verify if the testers had actually been purchased by the Debtor or leased by the Debtor. Mr. Kingery recalled that there were 7 to

9 lines in good working condition (a line being several pieces of equipment that worked together to manufacture the electronic components) remaining at the building when the Debtor ceased operations, but that he had not purchased any of those lines and he did not know which components of the lines, if any, were owned or leased by the Debtor. Mr. Kingery explained that in his current position with Flextronics he purchases lines which cost between $400,000 and $500,000.

Mr. Hartstein also testified that he thought there were seven operational lines at the facility upon closing which were purchased originally at $2 million each and which were eventually shipped at closing to Chihuahua and Canada. He also acknowledged that some of the equipment was owned by the Debtor and some of it leased but did not testify as to any specifics with respect to the equipment.

B.J. Desai, who managed all the subsidiaries' equipment for SMTC Corporate, testified on behalf of the Defendants. Mr. Desai actually prepared a list of each piece of equipment the Debtor transferred to Chihuahua and Canada. Exh. P-124. The list contained each manufacturer, serial and model number, ship date (which were dates in March and April 2003) and whether the equipment was owned by the Debtor or leased at time of shipment. The list also placed a value on each item. The SMTC Texas owned equipment was valued at no more than $301,000. In February 2003 the Debtor's total assets on the Balance Sheet totaled $20.614 million and its current liabilities were $6.706 million. Exh. D-2, lines 324, and 338. At that time the portion of the Lehman Loan carried on its balance sheet was $19.736 million. Exh. D-2, line 342. In March of 2003, the total assets on the Debtor's Balance Sheet (which did not include the capital assets) was $14.916 million and its current liabilities were $5.487 million with the portion of the Lehman Loan being $20.705 million. Exh. D-2, lines 324, 338 and 342. By April 2003 (when the $301,000 of Debtor's assets were fully transferred to Chihuahua and Mexico) the Debtor listed total assets of $7.513 million, current liabilities of $6.3 million, and the Debtor's portion of the Lehman Loan was $16.097 million. Exh. D-2, lines 324, 338 and 342.

The Trustee produced a personal property tax appraisal reflecting furniture, fixtures and equipment valued as of January 29, 2002, at $4,212,334. The Defendants claim SMTC Chihuahua and SMTC Canada assumed Debtor's portion of the Lehman Loan as consideration for this exchange; however, the Debtor continued to carry the Lehman Loan on its books until December 2003 and listed the Lehman Loan in its entirety on its bankruptcy schedules.

The Debtor wrote off its capital assets to zero in March 2003 and did not place these assets back on its books. The Debtor recorded all items in accordance with Generally Accepted Accounting Priniciples. KPMG audited the Debtor and its affiliates. The Debtor and its affiliates regularly reported on a consolidated basis to the SEC and issued 10-Ks annually regarding its operations.

### The Facts Regarding the Decision to Shut Down

On May 22, 2002, Paul Walker, president of SMTC Corporate as well as the president of the Debtor, sent an email to a group of SMTC executives asking them to help prepare a proposal for the board of directors of SMTC Corporate. Exh. P-80. The proposal envisioned by Mr. Walker involved closing the Austin facility in the 3rd quarter of 2002, but "[t]he actual timing is not as important as determining the restructuring charges and balance sheet impact." Exh. P-80.

On May 29, 2002, Paul Walker, along with other corporate executives, traveled to Austin and negotiated a disengagement with Dell that required a methodical winding down of business between Dell and the Debtor as the Debtor continued to sell product to Dell through 2002. That same day Paul Walker emailed SMTC executives the following:

> We just told Dell we are disengaging, they understood, and we are going to put a plan in place to be finished in the next few months.
>
> They committed to keep it confidential, as we have not told anyone at SMTC yet, and we need to keep it amongst ourselves as well, as it has effects on the Austin site and people.
>
> Freeing up this working capital to deploy to other sites and programs is the way to go, and in my opinion, is a major step in insuring the financial health and long term viability of SMTC.
>
> I have given the finance team certain scenario's to model as to what SMTC will look like for the rest of 2002 and 2003 and my guess is "...short term pain in 2002 for long term gain in 2003..." but let's see what the scenario's look like. . . .

Exh. P-81.

On May 31, 2002, Phil Woodard, the COO of SMTC Canada, sent an email to corporate executives (including Mr. Walker). Exh. P-82. In the body of the email, Mr. Woodard asked the others for their help in finalizing the worksheet so that it could be presented at the board meeting:

We need to complete this in draft form for presentation to the Board on Tuesday so we need [the] following reviewed ASAP:

1. Building Lease–Gary lets have BJ [Desai] finish the summary of the lease today. I just plugged in a 3 year obligation as a starting point and you can see that drives $6.5m of lease payments and probably another $5m of building maint. And tax's. We need to discuss other options of sub-letting it earlier, buying the building and then reselling it or bankrupting the Texas company and walking away from the lease.

There are no board minutes from the board meeting held June 4, 2002 reflecting what actions the Board did or did not approve with respect to the Debtor's operations. These minutes were requested by the Trustee in discovery but were never produced by the Defendants or used at trial by the Defendants. At the time of these emails in May 2002, the Debtor's books reflected over $66 million in assets. Exh. D-2, line 324. Current liabilities were $30 million and the Debtor's portion of the Lehman Loan was $41.565 million. Exh. D-2, line 338 and 342.

On September 9, 2002, Kirk Hartstein received an email from Scott Jessen of the Morse Company which reflects that this company was attempting to lease or sell the property (and attaches the confidential property offering materials) and which states that Mr. Jessen is "excited about working with you [the Debtor] to find a user that is interested in buying and or leasing the facility." Mr. Jessen indicates in his email that he is sending a copy of the materials to Mike Carney and Dan Hollingsworth of Flextronics for their comments. Exh. D-322. Mr. Hartstein testified that the email reflected some of the efforts of the Debtor to sublet/sell the building after the Dell disengagement.

On September 19, 2002, Phil Woodard again emailed certain corporate executives regarding closure of San Jose, Charlotte, and Donegal, Ireland sites. In connection with Austin, he indicated a plan for Austin to remain for "entire year" based on being able to settle with "Flex" and have a transition plan with Alcatel. Exh. P-83.

On September 24, 2002 Kirk Hartstein sent the following email regarding the Debtor's continuing operations:

Dave:

Thank you for taking the time to talk with me this morning.

As I mentioned, SMTC is remaining in Austin. We have disengaged with Dell, (our decision due to pricing pressures), but still remain supporting Alcatel, General Bandwidth and Xplore Technologies in Austin. We have about 120 employees at the facility and are working to grow the business back.

Exh. D-321.

On January 22, 2003 Phil Woodard sent the following email to Gary Walker, Paul Walker, and Derek D'Andrade at SMTC Corporate:

> Austin-
>
> - I spoke to John this morning, he see's [sic] the writing on the wall with Alcatel's lower requirements.
>
> - I think we need to make the decision to shut the site down by end of Q1 by next week to give us enough time to do it by end of March.

Exh. P-84.

On February 14, 2003, John Sommerville sent an email to Paul Walker copying Gary Walker and Phil Woodard:

> w.r.t. Alcatel they did communicate their intent to end production of the Quads/ABCU's during meetings with Paul and later me in late December. Production was to end in March '03. They have significantly increased their fcst. to us for Feb./Mar. To the point where SMTC has the majority of production on the above assemblies vs. the planned 30%. On 2/13 they confirmed that despite their ongoing performance issues in Nogales it is still their intent to migrate both products to Nogales and SMTC will not see loading beyond March '03.

Exh. P-85. On February 14, 2003, Paul Walker drafted a return email to John Sommerville:

> 1) Nothing stays internal, and it will be out in public in a "New York minute. ."
> 2) Do we have to specifically mention Alcatel? As I am sure they do not want to be blamed for this, but just as important the message will get all messed up as more people in the industry become aware, and I know it will end up being that "SMTC lost the Alcatel account" completely which is far from the truth.
> 3) Can't we just do the WARN for now, which indicates "significant" reductions and then in the next short while ie 1 to 2 weeks take it to a shutdown decision.
> 4) We still have to prepare our complete game plan for talking to Flex, so we may need a week or so on that. . . .

Exh. P-85.

A March 19, 2003 email from John Sommerville to Paul Walker regarding a Flextronics tour of the building stated:

> Terry is the GM of Flextronics Plano site. He is looking for 20K sq. ft. for some work they plan to do for Applied. He wanted to make sure I was comfortable with collocation. I don't think he had any other agenda. If he was checking us out the place is still busy and staffed so it would not be obvious we are exiting next month.

Exh. P-87.

In a March 25, 2003 email to Paul Walker, Nicholas Giordano, the on-site controller, stated:

> I received a call from Melissa Stone–Credit Manager of Flextronics . . . inquiring about the March rent payment ($185K). Apparently, Flextronics has done a financial review and they would like SMTC to sign a Parent Company Guaranty for the Austin Facility. You've got to love the timing on this one!

> I told her I would look into the March Rental payment and get back with her today. The check is cut, but has not been released by the site per John S. Do you want me to release the check.
>
> She will be forwarding the PCG documentation to me and I will subsequently forward it on once I get it. I have not committed or enlightened her about Austin's present scale back. . . .

Exh. P-86. Paul Walker's same day response to Mr. Giordano was to release the check and say no more. Exh. P-86. However, the Debtor did not send the March rent check.

When Flextronics demanded payment of the rent from the Defendants on April 3, 2003, Paul Walker responded on April 9, 2003, with:

> When looking at the Texas operation, it is a stand alone entity, and at this point, due to the downturn in business, doesn't have any assets to speak of, let alone cash for buyouts. We do have 20 acres of land valued at $500k, that although is is [sic] pledged to the bank group, our attorneys feel strongly that we can get it released, and offer it to Flex as that is really the only asset of any value in the entity. I realize that the last thing you want is more land in Texas, but frankly, that is all we have.

Exh. P-89. In March 2003, the Debtor's balance sheet showed nearly $15 million in assets, Exh. D-2, line 324, $5.487 million in current liabilities, and the Debtor's portion of the Lehman Loan was $20.705 million. Exh. D-2, lines 338 and 342.

On Wednesday April 9, 2003, Flextronics employee, Mike Carney, sent an email to Paul Walker that stated:

> Thank you for your input in describing your difficulties in Texas, obviously a 500k settlement would not be attractive or acceptable to Flextronics with 8 years remaining on a 10 year lease. As I do understand your difficulties in Texas I would look to you to provide Flextronics with a more suitable settlement knowing you would need to draw from resources other than your Texas corporation.

Exh. P-117.

Prior to shutting down, the Debtor paid $3.5 million to most of its remaining creditors. Exhs. D-77 and D-348. The Debtor made its monthly payments to Flextronics through February 2003.

The Debtor filed bankruptcy on December 14, 2004. It listed on its schedules the full amount of the Lehman Loan as a liability.

Seven proofs of claim were filed in the Debtor's bankruptcy: (1) the claim of Flextronics (later amended) for $6,471,190.32, (2) an electric bill in the amount of $9,209.82 for services billed in May, June and July of 2003, after the Debtor had exited the building, (3) a secured claim by Travis County of $272,333.86 for property taxes for the years 2003 and 2004, (4) secured

claims by Round Rock ISD of $133,247.99 for property taxes for the years 2003 and 2004 and for 2005 and 2006, and two minor unsecured claims, (5) a claim by Bax Global Exchange for $114.40 for services performed between October 27, 2004 and November 15, 2004, (6) a claim by Digikey Corp. for $577.30, and (7) a claim by Broadway Advisors for an alleged preferential payment received by the Debtor, in the amount of $1,391,402.95, which apparently is no longer being pursued.

Although SMTC Texas stopped paying rent after the February 2003 payment, the $475,000.00 security deposit held by Flextronics satisfied the Debtor's March and April rent as testified to by Kell Mercer. SMTC Texas surrendered the building on May 22, 2003. After the Debtor's surrender of the property, Flextronics occupied the building and eventually sold it to Long Vista Industrial, L.P., on August 2, 2005 for $8.25 million. Exhs. D-326 and D-277.

### The Facts Regarding Corporate Control and Corporate Formalities

SMTC Corporate was involved in the day to day operations of the Debtor. SMTC Corporate made the decision to disengage from Dell. Hartstein and Sommerville both testified that the Debtor requested permission from corporate to proceed with certain operations. And, the Debtor operated with no cash. HTM/SMTC Canada handled the financing for all the operating subsidiaries and determined what funding and when should be made to the subsidiaries to pay each's expenses. This was in part due to the structuring of the Lehman Loan and the entities' attempts to save on interest payments. Mr. Winter testified that SMTC Corporate's stance on controlling certain operations was much more pronounced after the large decline in value in 2000 in the technology sector of the economy. Additionally, this centralized control obtained economies of scale, i.e., SMTC Corporate provided various services to the Debtor in an attempt to control costs at each site.

After March 2003, any cash received by HTM was never redirected back to the Debtor to pay Flextronics. All the Debtor's manufacturing equipment was transferred to Chihuahua and Canada. All of the Debtor's accounts receivable and other assets were liquidated by the end of 2003. Paul Walker told Flextronics that the Debtor had no assets to speak of when in fact the books showed not only accounts receivable and inventory but certain fixed manufacturing assets and land. He did, however, indicate that the Debtor owned land although that asset was subject to the bank loan and had questionable value for settlement purposes. At the time he relayed this

information, in April of 2003, the Debtor's assets were $7.513 million, its current liabilities were $6.3 million, and its portion of the Lehman Loan was $16.097 million.  Exh. D-2, lines 324, 338 and 342.

## CONCLUSIONS OF LAW

To create liability under TUFTA, the Debtor must have made a transfer or have incurred an obligation:

1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

2) without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transactions; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. Com. Code Ann. § 24.005(a) (Vernon 2009).

In addition, § 24.006(a) (Transfers Fraudulent as to Present Creditors) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Tex. Bus. Com. Code Ann. § 24.006(a) (Vernon 2009).

Thus, other than the claims involving the Expense Reallocations (which were obligations incurred, not transfers of assets), each of the Trustee's claims requires the "transfer" of an "asset," both of which are defined terms for purposes of TUFTA.  The term "asset" is defined as "property of a debtor, but the term does not include: (A) property to the extent it is encumbered by a valid lien. . ..."  Tex. Bus. Com. Code Ann. § 24.002 (2) (Vernon 2009).  In that same section, transfer is defined as "[t]ransfer" means every mode . . . of disposing of or parting with an asset or an interest in an asset . . .."  Tex. Bus. Com. Code Ann. § 24.002 (12) (Vernon 2009).

Further, § 24.003 of TUFTA regarding "insolvency" provides:

(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying the debtor's debts as they become due is considered to be insolvent.

. . .

(d) Assets under this section do not include property that has been transferred, concealed or removed with intent to hinder, delay or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.

(e) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

Tex. Bus. Com. Code Ann. § 24.003(a), (b), (d) and (e) (Vernon 2009).

Section 24.004 of TUFTA regarding "value" provides, in relevant part:

(a) Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but does not include an unperformed promise made otherwise than in the ordinary course of the promisor's business to furnish support to the debtor or another person.

. . .

(d) "Reasonably equivalent value" includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arms length transaction.

Tex. Bus. Com. Code Ann. § 24.004(a) and (d) (Vernon 2009).

Proof that assets were transferred and an assessment of their value are essential to sustaining a fraudulent conveyance action. *Retamco Operating, Inc. v. Republic Drilling Co.,* 278 S.W.3d 333,341 (Tex. 2009). "It is the creditor's burden to offer evidence addressing the elements of fraudulent transfer as to each transfer." *Walker v. Anderson,* 232 S.W.3d 899, 913 (Tex. App.–Dallas 2007, no pet.); *Tow v. Pajooh (In re CRCGP LLC),* Adv. No. 07-3117, 2008 WL 4107490, at *3 (Bankr. S.D. Tex. Aug. 28, 2008); *see G.M. Houser, Inc. v. Rodgers,* 204 S.W.3d 836, 843 (Tex. App.–Dallas 2006, no. pet.). Further, the Trustee bears the burden of proving all elements of his TUFTA claims by a preponderance of the evidence. *Walker v. Anderson,* 232 S.W.3d at 913; *Tow v. Pajooh,* 2008 WL 4107490, at *3; *In re Sullivan,* 161 B.R. 776, 780 (Bankr. N.D. Tex. 1993); *Texas Custom Pools, Inc. v. Clayton,* No. 08-07-00197-CV, 2009 WL 656280, at *8 (Tex. App.– El Paso Mar. 12, 2009) (op. on motion).

As discussed above, the Defendants moved at the close of evidence under Rule 52(c) for judgment as a matter of law on several grounds. Specifically, they argued (as they had in their previous motion under that Rule, which was denied by the Court) that none of the transfers at issue involved "assets" subject to "transfer" (as those terms are defined under TUFTA) because all of the Debtor's assets were encumbered by a valid lien. Defendants also asserted that the Trustee: (1) failed to prove insolvency, (2) failed to produce sufficient evidence under § 24.005(a)(1) to prove actual intent to hinder, delay, or defraud a creditor, (3) produced no evidence under § 24.005(a)(2)(A) and (B) to show that the Debtor failed to receive reasonably equivalent value for the property it transferred, and (4) failed to provide sufficient evidence to support his veil-piercing theories.

The Court may render judgment on partial findings after hearing all the evidence. Fed. R. Civ. P. 52(c); Fed. R. Bankr. P. 7052. The Court is not bound by the denial of a motion for judgment as a matter of law made at the conclusion of plaintiff's case. *See Weissinger v. U.S.*, 423 F.2d 795, 797-98 (5th Cir. 1970). As the ultimate fact-finder in a bench trial, the Court need not draw any special inferences in favor of the nonmovant. *Premier Capital Funding, Inc. v. Earle (In re Earle)*, 307 B.R. 276, 289 (Bankr. S.D. Ala. 2002); *Regency Holdings (Cayman), Inc. v. The Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 374 (Bankr. S.D.N.Y. 1998). Rather, the Court may weigh the evidence, resolve any conflicts and decide where the preponderance of evidence lies. *Earle*, 307 B.R. at 289; *Regency Holdings*, 216 B.R. at 374.

Certain of the issues raised by the Rule 52(c) Motion and raised generally by the evidence presented at trial affect many of the causes of action asserted, and they will be addressed first. Those three preliminary issues are: (1) whether the Trustee's expert testimony was sufficient, (2) whether the lien securing the Lehman Loan fully encumbered all of the Debtor's property so that, as defined in TUFTA, there was no "asset" that could have been the subject of a "transfer," and (3) whether the Debtor was insolvent at the time of the challenged transfers.

The other issues raised by the Defendants in their Rule 52(c) Motion are discussed below in the Court's conclusions on each of the elements of the Trustee's TUFTA claims and veil-piercing theories.

### Preliminary Issue I
### Whether the Trustee's Expert Testimony Was Sufficient

The Defendants claim that the Trustee's expert testimony is insufficient because it is based on unreliable data and therefore cannot support the fact findings necessary to a judgment for the Trustee. *See* Defendants' Rule 52(c) Motion. The Defendants argue that Mr. Alexander's opinions are speculative and unreliable because he relied, in part, on data compiled by Forensic Strategic Solutions ("FSS) and should not be considered by the Court. The Trustee originally retained FSS as the forensic consulting firm to the estate on an hourly-rate basis, but was later forced to place FSS on a contingency arrangement because of limited estate funds. Mr. Alexander was retained to testify in this case after Ms. Reinhart's firm, FSS, was disqualified as an expert witness because of the contingency compensation arrangement that Texas law prohibits as unethical.

The Defendants claim that Mr. Alexander testified that he relied on FSS to collect information critical to his analysis. He also testified that he received and reviewed a copy of FSS's initial report, which could not be used because of the improper compensation agreement.

Mr. Alexander testified that he relied on FSS to simply gather raw financial data that had been produced by the Defendants to the Trustee. He further testified that the only compilations he might have relied upon are the summaries of bank statements and bank "downloads" that he used to create his Net Balance Chart. Exh. P-9. These bank statements and downloads were produced by Defendants in discovery. Further, the remainder of his analysis came straight from the numbers on the Debtor's balance sheet. Mr. Alexander's opinions are neither based on improper evidence nor speculative, and so they will be considered.

### Preliminary Issue II
### Whether the Lien Securing the Lehman Loan
### Fully Encumbered All of the Debtor's Property, So That There Was No "Asset"
### That Could Have Been the Subject of a "Transfer"

Other than his claim involving the Expense Reallocations, which involves the incurrence of a fraudulent obligation, not a fraudulent transfer of an asset, each of the Trustee's claims under TUFTA require a finding that there was a "transfer" of an "asset." Both of these terms are defined in TUFTA. Section 24.002(12) of TUFTA provides that "[t]ransfer" means every mode . . . of disposing of or parting with an asset or an interest in an asset." Section 24.002(2) provides

that "[a]sset" means property of a debtor, but the term does not include . . . property to the extent it is encumbered by a valid lien . . .." The Defendants contend that no "transfer" occurred because none of the Debtor's property that was conveyed was at the time an "asset." That is because, they argue, the evidence showed that "the extent" to which each item of property was "encumbered by a valid lien" was at all times complete–i.e. the property was fully encumbered.

First, the Defendants assert that whether the Debtor was liable for the entire balance on the Lehman Loan or for only a portion of it, at the time of each conveyance by the Debtor the amount of its liability, and the corresponding extent of the lien, exceeded the value of the particular item or items of property that the Debtor conveyed. Under this argument *each* of those items of property was not an "asset" that could have been "transferred" under TUFTA. The Defendants claim this result is mandated by ***Mullins v. TestAmerica, Inc.,*** 564 F.3d 386 (5th Cir. 2009).

Alternatively, the Defendants argue that even if the value of *all* of the Debtor's property that was subject to the lien was considered, because the Debtor was liable for the entire balance of the Lehman Loan, the value of the lien which secures the Lehman Loan exceeded the combined value of all the Debtor's property, and so at all times the Debtor's property was fully encumbered. Accordingly, the Defendants argue, none of the conveyances by the Debtor was a "transfer" that involved an "asset" of the Debtor.

The Trustee's position, if correct, defeats both these arguments. He does not dispute, and the Court so finds, that under the loan documents the collateral on which the Debtor granted the lien included all of its property. Exhs. D-35, D-36. The Trustee also does not dispute that the lien was valid. He claims, however, that the evidence at trial established that on each occasion when the Debtor's property was conveyed, its property was not fully encumbered by the lien.

To defeat either of the Defendants' arguments, the Trustee must establish that the debt that was secured by all of the Debtor's property was less than the value of that property. To do so he argues that, based on established case law involving insolvency determinations, the Debtor's liability should be considered contingent and reduced according to the likelihood that the Debtor would ever have had to pay on that liability. The Trustee then claims that the evidence showed that there was virtually no possibility at the time of the transfers that the Debtor would have had to pay any of the Lehman Loan, and so the Debtor's liability should be discounted to $0.00, or at least to a *de minimus* amount. Thus, the Trustee argues, at all relevant

26

times there was equity in the property conveyed by the Debtor and, therefore, the conveyances were "transfers" of "assets."

The Court's analysis of the broad issue of whether the Debtor in this case transferred any asset begins with the undisputed legal proposition that TUFTA does not apply to "an alleged fraudulent transfer of property to the extent that such property is encumbered by a security interest." **Mullins**, *supra*; *see **Yokogawa Corp. of Am. v. Skye Int'l Holdings, Inc.,*** 159 S.W. 3d 266, 269 (Tex.App.–Dallas 2005, no pet.) (noting that "[p]roperty encumbered by a valid lean [*sic*] is not an asset under TUFTA"); *see also **United States v. Commercial Tech., Inc.,*** 354 F.3d 378, 387 n.5 (5th Cir. 2003) (concluding that "an asset does not include, among other things, 'property to the extent it is encumbered by a valid lien'").

The two legal questions presented for the Court in connection with its decision on whether an "asset" could have been the subject of a "transfer" are (1) how to decide whether property conveyed is fully encumbered in the context of a blanket lien covering all assets of a debtor–i.e., whether the Debtor should be considered to have conveyed some of its encumbered property, or some of its equity with each conveyance; and (2) whether, for purposes of a TUFTA analysis, the Debtor should be considered to have been liable for the entire Lehman Loan balance. The first of these questions hinges on the Court's interpretation of the holding in *Mullins,* recently decided by the Fifth Circuit Court of Appeals.

Preliminary Sub-Issue IIA
Whether the Definition of "Asset" under TUFTA, as Interpreted in *Mullins,*
Means That Even When There Is Equity in the Collateral Considered as a Whole,
There Is No "Transfer" of an "Asset" So Long as
the Value of the Item(s) of Property Conveyed Is Less Than the Entire Secured Debt

As the Court understands it, the Defendants' first argument with respect to whether any "assets" were "transferred" starts from the indisputable proposition that the Trustee must prove each and every element with respect to each conveyance he claims was fraudulent. **Weller v. Anderson**, 232 S.W.3d 899, 913 (Tex. App.–Dallas 2007, no writ). From there, the Defendants reason that so long as each conveyance involved property that had a value less than the amount of debt secured by all of the Debtor's property, and even if that debt was determined to be something less that the entire balance of the Lehman Loan, each conveyance involved property

that was fully encumbered by a lien, which is not disputed to have been valid. Therefore, the Defendants assert, according to TUFTA's definitions, no conveyance was a "transfer" of an "asset." In support of their reading of the statute, the Defendants rely on the recent decision of the Fifth Circuit Court of Appeals in *Mullins v. TestAmerica, Inc.,* 564 F.3d 386 (5th Cir. 2009), which they claim is factually indistinguishable from this case.

The Trustee characterizes the issue presented by the Defendants' first argument based on their reading of *Mullins* as whether or not, in a case "[w]here the debtor has some equity in its total assets, and a portion of those assets is transferred to an insider, . . . the asset represents the debtor's equity." Trustee's Response to Defendants' Rule 52(c) Motion, p. 18. According to the Trustee, if the facts show that the value of *all* the Debtor's property was greater than the amount of debt secured by the lien, the property transferred should be considered to represent part of that equity rather than part of the encumbered collateral, so that *each* conveyance involved property that was not fully encumbered–i.e., each conveyance involved an "asset" that was "transferred."

This Court has previously ruled on this precise argument when it denied the Defendants' Rule 52(c) Motion presented at the close of the Trustee's case. Its decision has not changed, and for the reasons stated on the record on April 2, 2009, when it made that ruling, as repeated below, it rejects the Defendants' argument and now holds that any conveyance made by the Debtor at a time when the debt secured by all its property was less than the value of *all* that property, was a "transfer" of an "asset" under TUFTA.

*In Mullins* a creditor challenged, as a fraudulent transfer under TUFTA, a transfer of a portion of the proceeds of the sale of the debtor's assets to its majority shareholder. The material facts were: (1) the debtor, TestAmerica, owed a total of approximately $26.2 million to Fleet Capital Corporation; (2) the debt to Fleet was secured by a valid lien; and (3) according to the court, Fleet's "loans were secured by all of TestAmerica's assets." TestAmerica sold all its assets for $33.5 million, establishing the value of those assets. Therefore, at the time of the sale, there was equity of $7.3 million in the collateral available to pay other claims.

These facts in *Mullins* are analogous to those in this case if the Court finds that the debt secured by the Debtor's property was less than the combined value of all that property, at the time of the challenged conveyance. But in *Mullins,* however, there were additional facts that distinguish it from this case.

In *Mullins* at the closing of the sale the secured party partially released its lien, agreeing to be paid only $23 million in full satisfaction of its debt, and directing that the $3.2 million in proceeds that was released from the lien be instead transferred at closing to the majority shareholder of the debtor, Sagaponack Partners, LP. The Court held that the $3.2 million was fully encumbered by Fleet's lien and so under TUFTA was not an "asset" that was "transferred."

Looking solely at those facts and the result, it might appear that when the Court of Appeals found that the property transferred was fully encumbered and not an asset under TUFTA, it found the fact that there was equity in the collateral (collateral value of $33.5 million less secured debt of $26.2 million) to be immaterial, looking only at whether the value of the property transferred, $3.2 million to Sagaponack (even when considered with the $23 million that was transferred to Fleet), was less than or equal to the amount of the debt to Fleet–$26.2 million.

However, the third fact recited above–that the loans were secured by all the assets of the debtor–was only the court's observation of the parties' positions at a time *before* the transaction in question. It was not the situation by the time of the sale, and so not the transaction addressed by the court of appeals–i.e., at the time of the transfers to Fleet and Sagaponack, the loans were in fact *not* secured by *all* the assets of the debtor. Rather, the court points out that Fleet released its lien on the remaining collateral–the equity–at the closing of the transaction in question. *Id.* at 415 ("In consideration for HIG's payment of Fleets' discounted loan, Fleet agreed to release it security interests 'upon receipt of payment on the day of closing.'"). The value of Fleet's collateral from that point on was therefore limited to the amounts paid at closing–$23 million to Fleet and $3.2 million to Sagaponack, or $26.2 million total, and because the Court found *that* value to have been equal to the amount of the debt secured by that property–$26.2 million–it found that the property that was transferred was fully encumbered and not an "asset."

That is the critical distinction between *Mullins* and this case. In this case, truly *all* of the Debtor's property is undisputedly subject to the lien. Thus, the Court agrees with the Trustee that if the total value of all property exceeded the amount of the debt that it secured at the time of a conveyance, each item of property that was conveyed should be considered part of the Debtor's equity, and not fully encumbered. Therefore, as to any such "assets," the Debtor "transferred" them within the meaning of TUFTA.

<u>Preliminary Sub-Issue IIB</u>
<u>Whether the Debtor Should Be Considered Liable</u>
<u>for the Full Amount of the Lehman Loan Balance, or for Only Some Lesser Amount</u>

The Trustee claims that the Debtor's liability for the Lehman Loan was contingent or should be discounted to an amount reflecting the likelihood it would have to pay on its full guaranty on the Lehman Loan.  Therefore, he argues, there was equity in the Lenders' collateral, their lien did not fully encumber the Debtor's property, and its "assets" were thus "transferred" (both as defined in TUFTA).

<u>Whether the Debtor's Liability Should be Considered "Contingent"</u>

The Defendants rely on the express terms of the documents, and certain Texas cases involving joint and several guarantee liability, to support their assertion that at the time of the transactions in question, the Debtor was liable for the entire balance of the Lehman Loan.  In particular, the Second Amended and Restated Guarantee and Collateral Agreement, dated as of June 1, 2004 provides, in relevant part:

> 2.1 <u>Guarantee</u>.  (a) Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the General Administrative Agent, for the ratable benefit of the Lenders and their respective successors, indorsees, transferees and assigns, the prompt and complete payment and performance by the Borrower when due (whether at stated maturity, by acceleration or otherwise) of the Borrower Obligations.
>
> * * *
>
> 2.5 <u>Guarantee Absolute and Unconditional</u>. . . . Each Guarantor understands and agrees that the guarantee contained in this Section 2 shall be construed as a continuing, absolute and unconditional guarantee of payment . . . .. When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the General Administrative Agent or any Lender may, but shall be under no obligation to, make a similar demand hereunder or otherwise pursue its rights and remedies as it may have against the Borrower, any other Guarantor or any other Person or against any collateral security or guarantee for the Borrower Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any Lender to [do so] shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the General Administrative Agent or any Lender against any Guarantor. . . .

Exh. D-108, pp. 10-12.  In addition, the Guarantee Agreement provided that the Guarantors pledge their property as collateral to secure the entire Lehman Loan:

> * * *
>
> SECTION 3.  GRANT OF SECURITY INTEREST
> (a) Each Guarantor hereby confirms that pursuant to the Existing Guarantee and Collateral Agreement such Grantor has assigned and transferred to the General Administrative Agent, and hereby confirms that pursuant to the Existing Guarantee and

Collateral Agreement such Grantor has granted, or pursuant hereto hereby continues such grant, to the General Administrative Agent, for the ratable benefit of the Lenders, a first priority security interest (junior only to the Congress Liens) in all of the following property now owned or at any time in the future hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"), as collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of such Grantor's Obligations in respect of the [Lehman Loan]:

> [there follows a list of types of collateral that the parties agree covers every type of property of the Debtor]

Exh. D-108, p. 13.

It is undisputed that the Debtor was one of the Guarantors and Grantors under the Guarantee Agreement. "Borrower Obligations" as used therein is defined as, among other things, the "unpaid principal and interest on the [Lehman] Loan[ ]," without any limitation. Exh. D-108, p. 5. Thus, according to the terms of the documents, the Debtor was liable to the Lenders (as defined therein) for, and its property secured, the full amount of the Lehman Loan.

The Trustee argues that the Debtor's property should not be considered to have secured the entire balance of the loan because to burden the Debtor with the entire debt ignores the joint and several nature of the Debtor's obligation–that there were other obligors on the debt, including the primary obligor.

In particular, the Trustee claims that the liability should be reduced to $0.00 based on the reasoning of *In re Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir. 1988), the seminal case on the need to reduce or discount contingent liabilities in determining solvency.[3] In *Xonics*, the Court of Appeals addressed the valuation of one affiliate's guarantee and co-maker obligations in determining that affiliate's solvency for purposes of deciding whether a transfer was preferential under the Bankruptcy Code. The Court found that each of those obligations, as "a contingent asset or a contingent liability . . . . must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Id.* at 200.

---

[3] The issue in *Xonics* and most of the cases that follow it was insolvency, a determination of whether there is an excess of assets over total liabilities, in contrast to the issue here which is whether there is equity in a lender's collateral. No authority was cited by the Trustee, and the Court was unable to find any authority, applying the analysis of *Xonics* to the specific issue of whether property is an "asset" under TUFTA or under any other similarly worded fraudulent transfer statute. However, the two issues are virtually the same–both require a comparison of the value of assets to debt to determine the availability of assets to pay unsecured creditors. Therefore, the Court does not find *Xonics* to be distinguishable because it involved an insolvency analysis and not a determination of equity in collateral.

The Defendants contend that *Xonics* and the line of cases that follow it are not applicable to the Debtor's obligation under the Guarantee because those cases apply only to *contingent* claims and, by its terms (quoted above), the Guarantee was *not* contingent but rather it was "absolute and unconditional" and the Debtor's liability was several. This fact, they argue, compels the conclusion that the Debtor's liability should not be discounted at all.

In support, the Defendants cite a number of cases under Texas law for the propositions that a guarantee is not contingent, but is absolute and unconditional, when it requires no condition precedent to its enforcement other than the default of the principal obligor, and that a guarantor's liability under an absolute and unconditional guarantee is the same liability that the principal obligor bears. *See e.g., Reece v. First State Bank*, 566 S.W.2d 296, 297 (Tex. 1978); *Mid-South Telecommuni- cations Co. v. Best*, 184 S.W.3d 386, 391 (Tex. App.–Austin 2006, no writ); *RTC v. Northpark Joint Venture*, 958 F.2d 1313 (5th Cir. 1992); *see also* cases cited in Defendants' Motion for Final Summary Judgment (on Lien, Reasonably Equivalent Value and Conspiracy Issues) (filed under seal, see docket # 156), pp. 30-31.

With only one exception, the cases cited by the Defendants involved the legal rights and obligations of the parties in the context of the enforcement of a guarantee against the guarantor by the lender or other obligee.[4] This Court does not disagree with such decisions that find guarantees to be not legally "contingent" under those circumstances. In fact, it agrees with the Defendants that, under Texas law, the Guarantee in this case is "absolute" as between the Guarantors under the Guarantee Agreement (including the Debtor) and the Lenders. If this were a case involving the Lenders' legal right to enforce the Guarantee against the Debtor, the Court would find that they were entitled to recover from the Debtor the full amount of the outstanding balance of the Lehman Loan.

However, those are not the facts of this case. Instead, the Court is asked to determine, for purposes of deciding under TUFTA if the Debtor fraudulently conveyed its property, whether at the time of those conveyances the Debtor had equity in that property over and above the amount

---

[4] That one case, *In re Lloyd McKee Motors, Inc.*, 157 B.R. 484 (Bankr. D. N.M. 1993), involved the question of whether the claim of the lender against the guarantor was contingent and therefore could be estimated at something less than its full value for voting purposes in a Chapter 11 case. To the extent the case involved more than the enforcement of the guarantee by the lender against the debtor/guarantor–i.e., to the extent it involved considerations of fairness to other creditors–the case may be seen as similar to the instant case. At worst *McKee Motors* is distinguishable from this case because it involved voting rather than allowance and payment of a creditor's claim in a bankruptcy case. In any event, the decision is not binding on this Court.

of the lien securing the Lehman Loan.  Under these facts, there is a contingency present that is not present when a lender is enforcing its rights against the guarantor: the contingency that some or all of the debt may be satisfied by another obligor.

The difference is this.  At the point when a lender sues to collect from its guarantor, it has made its choice that it will seek payment in full from that particular obligor.  At that point, the focus is on the guarantor that is being sued and there is no contingency that the debt will be paid by another–the relief sought is that it be paid in full by the defendant guarantor.  However, in this case and in *Xonics* and similar cases, the issue to be decided is not what the lender is entitled to collect, but whether a guarantor's liabilities exceed its assets–i.e., whether a guarantor is insolvent for the purpose of deciding whether property had been fraudulently or preferentially transferred.  In such a case, it is necessary to consider whether the guaranteed debt would be satisfied by another obligor in order to decide whether or not there are enough of the guarantor's assets available to satisfy all claims against it.[5]  In other words, because the liquidation analysis performed by a court is hypothetical, it is entirely appropriate, even necessary, that a court also hypothesize the payment of the debt, in whole or in part, by another obligor.

Stated otherwise, the meaning of "contingent" used in *Xonics* and in this case is different from the one urged by the Defendants and supported by the cases they cite, that defines the legal rights and obligations of the parties to an obligation.  Rather, "contingent" as used in *Xonics* and as applicable here, is used similarly to its use in accountancy where it refers to a liability (or an asset) that, because of some possible occurrence in the future, should not be considered from the perspective of the owner/debtor to be "worth" its full face value.  "Discounting a contingent liability by the probability of its occurrence is good economics and therefore good law, for solvency . . . is an economic term."  ***Covey v. Commercial Nat. Bank of Peoria***,  960 F.2d 657, 660 (7th Cir. 1992).

---

[5] One can find, however, examples of courts including contingent liabilities at their face value when determining solvency.  K.O. Balmforth, Note, *Estimating Contingent Liabilities to Determine Insolvency in Bankruptcy Proceedings: In re Xonics Photochemical, Inc.,* 1989 B.Y.U. L. Rev. 1315, 1322 (1989) ("[A] line of cases has arisen under the Uniform Fraudulent Conveyance Act in which the practice of valuing contingent claims at their face amount was rigidly followed, with results that do seem, in the *Xonics* court's word, 'absurd.'") (footnotes omitted).  The logic of the analysis in *Xonics* and of the results it produces, and the number of courts that have followed it, convince this Court that under the facts of this case it is not appropriate to include the full face value of the Debtor's contingent liability under the Guarantee in determining the extent of the lien encumbering its assets (and, as discussed below, in determining its solvency).

The *Xonics* Court's discussion of its reasoning shows that this economic definition of
"contingent" is the one it used in its analysis:

> Every firm that is being sued or that may be sued, every individual who has signed
> an accommodation note, every bank that has issued a letter of credit, has a
> contingent liability. Such liabilities are occasionally listed on the firm's balance
> sheet, for example by earmarking a portion of surplus for contingent liabilities.
> (They are supposed to be listed "if the future event is likely to occur and if its
> amount can be reasonably estimated." Nikolai et al., Intermediate Accounting
> 6111 (3d ed. 1985) (emphasis in original).) More often they are listed in a
> footnote, thus leaving the firm's stated net worth undisturbed. Often they are not
> listed at all, when they are remote or when they are too small to affect net worth
> substantially. On the proper accounting treatment of contingent liabilities see *id.*
> at 610-14; Faris, Accounting for Lawyers 362-64 (3d ed. 1975); Williams, Stanga
> & Holder, Intermediate Accounting 609-17 (1984); Meigs, Mosich & Johnson,
> Accounting: The Basis for Business Decisions 288 (3d ed. 1972); Financial
> Accounting Standards Board, FASB Statement of Standards No. 5 (1975).

*Xonics*, 841 F.2d at 199-200.[6] Mr. Alexander's testimony shows that this economic definition,
and not the "legal definition" urged by the Defendants, is also the meaning of "contingent" that
he used in forming his opinions:

> the valuation of contingent liability . . . could be a liability arising under a
> guaranty agreement, it could be an asset arising under a recovery action such as
> this, and those are matters that auditors routinely consider, the valuation of the
> amount that should or should not be disclosed or recorded.
>
> *  *  *
>
> Because Generally Accepted Accounting Principles require disclosure of all
> important elements of a credit agreement, I didn't need to read the [Lehman Loan
> Credit] agreement. The most important thing that I needed to do was assess the
> likelihood or the probability that that contingent liability would become a reality,
> and do that not from reading the agreement; I made an assumption about what that
> agreement said based on the disclosures. You do that by evaluating the financial
> position of the company as well as reading the audit opinion . . . of the auditors
> that are also obligated to make the same kind of review in far more detail than I
> am.

---

[6] "The *Xonics* formula is a useful authoritative statement of a procedure for reducing contingent liabilities[,
b]ut it is, by no means, . . . the procedure most consistent with proper accounting treatment of contingent liabilities."
K.O. Balmforth, Note, *Estimating Contingent Liabilities to Determine Insolvency in Bankruptcy Proceedings: In re
Xonics Photochemical, Inc.,* 1989 B.Y.U. L. Rev. 1315, 1331 (1989). However, nothing "suggests that using the
*Xonics* rule and formula is improper in a legal setting, or even in accounting for that matter[, but rather i]t simply
shows that industry standards in accounting do not militate for the use of the *Xonics* rule and formula as 'proper
accounting treatment' of contingent liabilities." *Id.* at 1322 (footnote omitted).

Transcript–Alexander–March 26, 2009, p. 12, lines 12-18, p. 47, line 17 - p. 48, line 3.

Admittedly, Mr. Wheeler testified that one would "assess the value of the liability for a breach of a covenant" from the lender's perspective, and that "Lehman's risk upon breach of a covenant" was "[u]ltimately" the entire amount of the loan.  Transcript--Wheeler–April 3, 2009, pp. 47-49.  However, this testimony followed questioning by counsel about "the approximate minimum outstanding balance under the Lehman facility . . . *as to the whole company,*" a reference to the entire group of SMTC affiliates.  Transcript--Wheeler–April 3, 2009, pp. 48-49 (emphasis added).  Mr. Wheeler was never asked to provide an opinion on whether, for an accountant's consideration of equity in collateral or solvency, the Debtor *alone* should have been considered liable for the *entire* balance of the Lehman Loan.

Finally, a review of the facts of *Xonics* also confirms that the appellate court was using this definition of contingent, and not its "legal definition."  The obligations considered by the court in *Xonics* included not only the guarantee, but also an obligation as a co-maker on a note:

> The startling feature of the case is the parties' apparent assent to the proposition that if the loan guarantee *and the note that Xonics Photochemical had co-signed* were valid obligations, Xonics Photochemical was insolvent as of the date the obligations were assumed, on the theory that they created liabilities greater than the company's net assets (much greater: $28 million in liabilities versus less than $2 million in net assets). The proposition is absurd; it would mean that every individual or firm that had *contingent liabilities* greater than his or its net assets was insolvent-something no one believes.

*Id.* at 199 (emphasis added).  With a co-maker obligation, not even the condition of a primary obligor's default stands in the way of the lender's right to payment by the co-maker.  Yet the *Xonics* court applied the same analysis to that obligation that it did to the guarantee, considering them both contingent and both subject to being discounted depending on the likelihood of payment.  The contingency common to both obligations, in the context the court considered them in *Xonics*, is the possibility that another obligor on the debt will pay some or all of it so that the debtor as co-maker or guarantor would not do so.  That same contingency being present in this case, this Court finds that the Debtor's liability under the Guarantee at the time of the challenged conveyances was contingent within the meaning used in *Xonics*, so that it is proper and necessary to consider the probability that the Debtor would have to pay that obligation.

Whether the Trustee Proved the Debtor's Liability Should Be Discounted

In *dicta*, the Seventh Circuit Court of Appeals in **Xonics** suggested, as a method of determining the extent of the liability of the guarantor/co-maker, that the likelihood the guarantor/co-maker would have to pay the debt in full be converted into a percentage, and that that percentage be applied to the value of the assets of the guarantor/co-maker (on the theory that the amount the guarantor/co-maker could pay on the debt was limited to the value of its assets).[7] **Xonics**, 841 F.2d at 200. The Trustee urges this Court to adopt such a method, and argues that the evidence showed that the appropriate percentage of likelihood that the Debtor would have had to pay the Lehman Loan in full, determined as of the time of the conveyances in question, was 0%, or at least a percentage so small that it results in a *de minimus* liability.

In support, the Trustee offers the conclusion of his expert, Mr. Alexander, that "[t]he guaranty contingent liability could not have any reasonable value whatsoever based on the SEC forms filed by its parent company, by SMTC Texas's parent company, SMTC Corp." Transcript– Alexander–March 26, 2009, p. 47, lines 6-8. The basis for that conclusion, according to Mr. Alexander's testimony, was the Form 10-Ks of SMTC Corporate. for the years 2001 through 2004. Specifically, he testified that

> . . . contingent liabilities of that sort are disclosed in 10(k)s, so I obtained the SEC-filed Form 10(k)s for SMTC Corporate and read those financial statements, taking particular note of . . . [t]he assets of the parent company, the financial position of the parent company, and the audit opinion expressed by KPMG during the relevant years.

Transcript–Alexander–March 26, 2009, p. 46, line 22 - p. 47, line 4.

The Trustee argues that such information should persuade the Court, as it did Mr. Alexander, that there was virtually no likelihood that the Debtor would have to pay on the Guarantee, particularly when considered with other evidence that the Lehman Loan was never in default and that the Lenders never foreclosed on any assets of the Debtor, SMTC Corporate or any of the SMTC affiliates or other subsidiaries. *See* Plaintiff's Letter Brief to the Court, docket # 266, p. 3, filed April 1, 2009, in response to Defendants' Rule 52(c) Motion made at the close of

---

[7] In a later decision, however, the same court held that the proper formula was to apply the percentage of likelihood of payment to the full amount of the debt, not merely to the amount of the assets of the guarantor/co-maker that would be available to pay it. **Covey v. Commercial Nat'l Bank of Peoria**, 960 F.2d 657, 660-61 (7th Cir. 1992). The difference is immaterial in this case, however, inasmuch as the Trustee urges this Court to apply a factor of 0% as the appropriate percentage likelihood that the Debtor would have had to pay on the Guarantee.

Plaintiff's case; Transcript Mr. Wheeler April 6, 2009, p. 46 (to his knowledge, based on financial records he had reviewed, the Lehman Loan had never been "placed into default during the period of its existence."). As further evidence that the Debtor was never required to pay on the Guarantee and so the liability should be discounted to $0.00, the Trustee points to the fact that the Lehman Loan "was paid in full in 2004, including through the raising of equity to new investors." Exh. P-54, 2004 10-K of SMTC Corporate, at p. 18.

Courts have considered events occurring subsequent to challenged transfers, as well as those occurring contemporaneously with those transfers, as evidence on the likelihood a guaranteed obligation would be paid. For example, in *In re Martin*, 145 B.R. 933 (Bankr. N.D. Ill. 1992), *appeal dismissed,* 151 B.R. 154 (N.D. Ill. 1993), the bankruptcy court considered the payment "history" on the guaranties and the primary obligations following the date of the alleged fraudulent transfer. It found that, because the holders of the guarantees "had not called on [the debtor] to honor his guarantees as of June 1, 1985 [the date of the alleged fraudulent transfer], and neither of these creditors moved to enforce these guarantees during the four years after that date," and because the primary obligors "were paying their debts to [the creditors] in 1985," the creditors were unlikely to call on their guarantees at the time of the transfers and so the guarantee obligations should be "conservatively valued at zero" for purposes of the Court's analysis under Illinois fraudulent transfer laws. *Id.* at 943.

In this case, however, contrary to the Trustee's contentions, the evidence did not show that there were no subsequent defaults on the Lehman Loan. Rather, Jane Todd testified that the covenants of the Loan had been breached, but that the Lenders waived those defaults. *See also* Transcript–Wheeler–April 3, 2009, pp. 46-47. In addition, rather than having been paid in full from the resources of the other obligors, the Lehman Loan was in fact only partially paid by them, the balance having been restructured. Exh. P-54, pp. 17-18 ("On June 1, 2004, we completed . . . a transaction with SMTC's pre-existing lenders to repay a portion of SMTC's pre-existing debt and restructure the balance of SMTC's pre-existing debt . . .."). Specifically, "SMTC . . . repaid $40 million of debt at par; . . . exchanged $10 million of debt for $10 million of SMTC's common stock and warrants . . . and . . . converted $27.5 million in debt into second lien subordinated debt with maturity ranging from four to five years." Exh. P-54 at p. 18.

The Trustee argues that the Lenders' acceptance in 2004 of $10 million worth of SMTC's common stock and warrants in satisfaction of that amount of existing debt is also evidence that

the Lenders considered the other obligors as being able to pay the debt without the Debtor's participation, and therefore the risk that the Debtor would have had to pay on the Guarantee during the period 2002-2003 was *de minimus*. The Court finds, however, that such evidence may equally be considered as a concession made by the Lenders because of their assessment that the other obligors did *not* have the ability to pay the debt in full in cash.

Finally, although subsequent occurrences may be relevant to the likelihood of payment, they are not in this case conclusive. The determination of the amount of the Guarantee obligation that was secured by the lien on the Debtor's property must still be made as of the time of the alleged fraudulent conveyances–in 2002 and 2003. The fact that after those conveyances the Lehman Loan was satisfied by others obligated to pay it does not *necessarily* mean that it was likely or probable at the time of the conveyances that the Debtor could not have paid it. Those other obligors may have ultimately had to pay or restructure the Loan without the Debtor's participation because the Debtor *by that time* had become unable to pay its share. While that fact may be obvious in hindsight, in light of the Debtor's having ceased doing business, disposed of its assets and filed this bankruptcy case, the determination of whether to discount a debt because of the likelihood of payment should be made from the perspective of the Debtor, operating as it was *at the time of the transfers*. *See Travellers Int'l Ag v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 194, 196-97 (3ᵈ Cir. 1998) (determining solvency by treating the debtor as a going concern "[b]ecause liquidation in bankruptcy was not clearly imminent on the date of the challenged transfer" and therefore finding that the court "cannot consider the market's devaluation of [the debtor's publicly traded] debt resulting from the possibility as of the date of the transfer that [it] would cease operations and be unable to satisfy its promises.").

The Debtor in this case was still operating as late as March of 2003. Exh. P-87 (March 19, 2003 email from John Sommerville to Paul Walker, stating that "the place is still busy and staffed . . ."). Its financial statements show that it had sufficient assets to have made at least some significant payments on the Lehman Loan throughout the period when the transfers occurred, with the exception of December of 2003. In fact, it paid down its share of the Lehman Loan fairly steadily from April of 2002 to June of 2003, from a high of $43.184 million to $14.642 million. Exh. D-2, line 342. At worst, between July and December of 2003, the Debtor's share of the Lehman Loan increased less than 11%, from $15.624 million in July to

$17.327 in December, but until December it still listed assets in excess of $1 million. Exh. D-2, line 324. Overall, the Debtor reduced its share of the Lehman Loan by a total of $25.857, or by almost 60%, from April of 2002 to December of 2003. Exh. D-2, line 324. The Court finds, therefore, that when it made the transfers in question, the Debtor was paying or could have paid on its Guaranteed obligation.

The Court therefore cannot find that there was no likelihood that it would pay, or even that there was merely a *de minimus* probability that it would, and so finds that the Trustee's contention that the Debtor's liability on the Guarantee should be discounted to $0.00 or a *de minimus* amount is not supported by the evidence. The Trustee presented no evidence of any other appropriate discount. In the absence of such evidence, the Court is unable to find that the lien did not secure the entire amount of the Guarantee.

The inquiry as to whether the property transferred was fully encumbered, and therefore not an asset, does not end there. To determine whether the Debtor's property was fully encumbered, the debt–the entire balance of the Lehman Loan–must be compared to the value of the Debtor's property at the relevant times.

### Preliminary Sub-Issue IIC
### Whether the Lehman Loan Balance Exceeded the Value of All the Debtor's Property at the Time of the Conveyances

The parties and their experts focused on the Debtor's balance sheets as evidence of the value of the Debtor's property at the time of the conveyances. According to Mr. Wheeler's testimony, the approximate fair market value of the Debtor's property can be considered as reflected in the figures on line 324 of its financial statements. *Compare* testimony of Otto Lee Wheeler, April 3, 2009, Transcript p. 36, line 20, with line 324 on Exhs. D-1 and D-2. The following chart shows that comparison between the value of the Debtor's property as shown on its balance sheets (line 324 on Exhs. D-1 and D-2), and the entire balance on the Lehman Loan, according to the Consolidated Debt Spreadsheet ("Total Debt" on Exh. D-24).

| Date | Value of the Debtor's Property | Entire Balance of the Lehman Loan |
|------|-------------------------------|-----------------------------------|
| January 2002 | $ 50,297,000.00 | $138,753,000.00 |

| Date | Value of the Debtor's Property | Entire Balance of the Lehman Loan |
|---|---|---|
| February 2002 | 53,451,000.00 | 132,622,000.00 |
| March 2002 | 57,373,000.00 | 112,452,000.00 |
| April 2002 | 63,950,000.00 | 131,903,000.00 |
| May 2002 | 66,108,000.00 | 119,970,000.00 |
| June 2002 | 60,349,000.00 | 114,036,000.00 |
| July 2002 | 59,539,000.00 | 118,577,000.00 |
| August 2002 | 50,837,000.00 | 104,602,000.00 |
| Sept. 2002 | 38,296,000.00 | 90,163,000.00 |
| Oct. 2002 | 32,768,000.00 | 96,509,000.00 |
| Nov. 2002 | 30,890,000.00 | 92,307,000.00 |
| Dec. 2002 | 22,129,000.00 | 82,589,000.00 |
| January 2003 | 22,232,000.00 | 82,311,000.00 |
| February 2003 | 20,614,000.00 | 86,844,000.00 |
| March 2003 | 14,916,000.00 | 80,869,000.00 |
| April 2003 | 7,513,000.00 | 79,197,000.00 |
| May 2003 | 4,599,000.00 | 76,426,000.00 |
| June 2003 | 2,332,000.00 | 67,160,000.00 |
| July 2003 | 1,360,000.00 | 77,716,000.00 |
| August 2003 | 1,299,000.00 | 77,592,000.00 |
| Sept. 2003 | 1,181,000.00 | 74,922,000.00 |
| Oct. 2003 | 1,270,000.00 | 72,717,000.00 |
| Nov. 2003 | 1,206,000.00 | 76,170,000.00 |
| Dec. 2003 | 83,000.00 | 70,077,000.00 |

This comparison, standing alone, would indicate that there was no equity in the Debtor's property for all of the period 2002 through 2003.

The Trustee argued, however, that there is another reason, other than discounting the Debtor's liability on its Guarantee of the Lehman Loan, why its property was not fully

encumbered at that the time of the conveyances.  He argues that the Debtor's rights of contribution against the other obligors on the Lehman Loan should be included as part of its property.  When the value of those rights of contribution is included, the Trustee claims, the value of all the Debtor's property exceeded the amount of the lien, and so the property was not fully encumbered at the time of the conveyances.

The language of the Guarantee Agreement supports the Trustee's position in theory, inasmuch as it expressly provides for such rights of contribution.  Paragraph 2.2 provides:

> 2.2 Right of Contribution.  Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment. . . . The provisions of this Section 2.2 shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the General Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

Exh. D-108, p. 10.

The Defendants point out that under the language of Paragraph 2.2, the Debtor's obligation to the Lenders under the Guarantee is not affected by its rights of contribution, and so argue against considering them when determining the extent of the lien on the Debtor's property.  They cite *First City Beaumont v. Durkay (In re Ford)*, 967 F.2d 1047 (5th Cir. 1992), in support.  In *Ford*, the Court of Appeals addressed the rights of the obligee, the bank, which had actually asserted a claim (by filing a proof of claim against the co-maker/debtor) for the entire amount of the debt.  The trustee argued that in light of the debtor's rights of contribution, the court should estimate, as a contingent liability, the amount of the debtor's liability as a co-maker on the note.  The Court of Appeals held that the bank was entitled to assert a claim for the entire amount of the debt, but it also acknowledged the right of the co-maker (or guarantor) to collect from its co-obligors their proportionate share(s) of the debt.  *Id.* at 1053 ("[T]he debtor's right to pursue the other co-makers is independent of the creditor's right to payment of the debt, and in no way affects the creditor's right to pursue its claim for the full amount against any co-maker, including the debtor.").  *See also, generally, Clare v. Traders Nat'l Bank*, 13 S.W. 183, 187 (Tex. 1890) ("While all were bound to the lender, as between themselves, each was primarily bound for the money by him received, and, from that standpoint has the right to protect himself."); *Barton v. Farmers' State Bank*, 276 S.W. 177, 183 (Tex. 1925) ("For while, in respect of the bank,

41

Barton, Hutto, and McCann are principal debtors, jointly and severally liable, yet, as between themselves, each is a principal only to the extent of his aliquot part of the debt and a surety for the remainder.").

Much of the evidence that is relevant to the value of the Debtor's rights of contribution is the same as described above with respect to the Trustee's argument that the Debtor's liability on the Guarantee should be discounted: the 10-K of SMTC Corporate, containing financial information showing its ability to pay the Lehman Loan and information regarding its ultimate payment and/or restructuring by obligors other than the Debtor, and the testimony of Jane Todd that the Lenders never foreclosed on any of the Debtor's property securing the Lehman Loan. While the Court has found that such evidence is insufficient to show how likely it was, and to what extent, that the Debtor would be called upon to pay the Guarantee, it does find that SMTC Corporate's financial information and the information regarding the Lehman Loan's subsequent payment and restructuring by obligors other than the Debtor support the Trustee's position that the other obligors had the ability to pay the Lehman Loan in full and, therefore, the Debtor's rights to contribution from those other obligors had substantial value.

However, under Para. 2.2 of the Guarantee Agreement, the parties, including the Debtor, expressly limited the right of each guarantor for contribution to the amount by which it "shall have paid more than its proportionate share of any payment made" on the Lehman Loan. Thus, one must assume that the Debtor had paid more than its share to "trigger" a right to contribution. Therefore, even if one assumed that all the other guarantors had the ability to pay the Lehman Loan *in full*, the value of the Debtor's rights of contribution could be no more than the total balance on the Lehman Loan less the Debtor's "proportionate share" of that debt.

The evidence showed that each guarantor's "proportionate share" of the Lehman Loan was the amount of the proceeds of that Loan that that guarantor had actually received and used or was used by an affiliate for its benefit. Specifically, the Debtor received, on a daily basis, a portion of the proceeds of the Lehman Loan funded through HTM, and used those borrowed funds in its daily operations.

The testimony of Messrs. Wheeler and Skerjl and the Debtor's bank records established the amount of the Lehman Loan proceeds that it used in its operations on a monthly basis, a figure that is reflected as a line item on its financial statements. Exhs. D-15, D-16, 10850 Consolidated Disbursement Account Bank Reconciliations (Comerica 5393) (showing draws

from the Lehman Loan credit facility and transfers to the Debtor's Comerica account ending in 4651). By the Defendants' own admission, the "Sub-Total Revolver" entries on line 342 of its financial statements reflected the Debtor's proportionate share of the Lehman Loan balance during the relevant time period. *See e.g.*, Defendants' Supplemental Reply to Plaintiff's Supplemental Response to Defendants' Rule 52(c) Motion, p. 4 ("[T]he debt reflected on line 342 of the Debtor's financial statements . . . constitutes SMTC Texas's individual balance on the Lehman loan; the amount of the Lehman loan actually used and ultimately never re-paid by SMTC Texas . . ..").

Using again the figures from the Debtor's financial statements, the following chart shows the value of the Debtor's rights of contribution during the relevant periods:

| Date | Entire Balance of the Lehman Loan | Debtor's Proportionate Share of the Lehman Loan | Value of Debtor's Rights of Contribution |
|---|---|---|---|
| January 2002 | $138,753,000.00 | $ 32,715,000.00 | $106,038,000.00 |
| February 2002 | 132,622,000.00 | 33,435,000.00 | 99,187,000.00 |
| March 2002 | 112,452,000.00 | 35,603,000.00 | 77,300,000.00 |
| April 2002 | 131,903,000.00 | 43,184,000.00 | 88,716,000.00 |
| May 2002 | 119,970,000.00 | 41,565,000.00 | 78,405,000.00 |
| June 2002 | 114,036,000.00 | 35,619,000.00 | 78,417,000.00 |
| July 2002 | 118,577,000.00 | 33,930,000.00 | 84,647,000.00 |
| August 2002 | 104,602,000.00 | 27,990,000.00 | 76,612,000.00 |
| Sept. 2002 | 90,163,000.00 | 25,129,000.00 | 65,034,000.00 |
| Oct. 2002 | 96,509,000.00 | 23,894,000.00 | 72,615,000.00 |
| Nov. 2002 | 92,307,000.00 | 21,544,000.00 | 70,763,000.00 |
| Dec. 2002 | 82,589,000.00 | 19,971,000.00 | 62,618,000.00 |
| January 2003 | 82,311,000.00 | 21,462,000.00 | 60,849,000.00 |
| February 2003 | 86,844,000.00 | 19,736,000.00 | 67,108,000.00 |
| March 2003 | 80,869,000.00 | 20,705,000.00 | 60,164,000.00 |
| April 2003 | 79,197,000.00 | 16,097,000.00 | 63,100,000.00 |
| May 2003 | 76,426,000.00 | 15,395,000.00 | 61,031,000.00 |

| Date | Entire Balance of the Lehman Loan | Debtor's Proportionate Share of the Lehman Loan | Value of Debtor's Rights of Contribution |
|---|---|---|---|
| June 2003 | 67,160,000.00 | 14,642,000.00 | 52,518,000.00 |
| July 2003 | 77,716,000.00 | 15,624,000.00 | 62,092,000.00 |
| August 2003 | 77,592,000.00 | 15,757,000.00 | 61,835,000.00 |
| Sept. 2003 | 74,922,000.00 | 15,925,000.00 | 58,997,000.00 |
| Oct. 2003 | 72,717,000.00 | 16,218,000.00 | 56,499,000.00 |
| Nov. 2003 | 76,170,000.00 | 17,093,000.00 | 59,077,000.00 |
| Dec. 2003 | 70,077,000.00 | 17,327,000.00 | 52,750,000.00 |

The following chart shows the values of the Debtor's property, when its rights of contribution are included, during the relevant periods:

| Date | Value of Debtor's Rights of Contribution | Value of the Debtor's Property Not Including Rights of Contribution | Total Value of the Debtor's Property Including Rights of Contribution |
|---|---|---|---|
| January 2002 | $106,038,000.00 | $ 50,297,000.00 | $156,335,000.00 |
| February 2002 | 99,187,000.00 | 53,451,000.00 | 152,638,000.00 |
| March 2002 | 77,300,000.00 | 57,373,000.00 | 134,673,000.00 |
| April 2002 | 88,716,000.00 | 63,950,000.00 | 152,666,000.00 |
| May 2002 | 78,405,000.00 | 66,108,000.00 | 144,513,000.00 |
| June 2002 | 78,417,000.00 | 60,349,000.00 | 138,766,000.00 |
| July 2002 | 84,647,000.00 | 59,539,000.00 | 144,186,000.00 |
| August 2002 | 76,612,000.00 | 50,837,000.00 | 127,449,000.00 |
| Sept. 2002 | 65,034,000.00 | 38,296,000.00 | 103,330,000.00 |
| Oct. 2002 | 72,615,000.00 | 32,768,000.00 | 105,383,000.00 |
| Nov. 2002 | 70,763,000.00 | 30,890,000.00 | 101,653,000.00 |
| Dec. 2002 | 62,618,000.00 | 22,129,000.00 | 84,747,000.00 |
| January 2003 | 60,849,000.00 | 22,232,000.00 | 83,081,000.00 |
| February 2003 | 67,108,000.00 | 20,614,000.00 | 87,722,000.00 |

| Date | Value of Debtor's Rights of Contribution | Value of the Debtor's Property Not Including Rights of Contribution | Total Value of the Debtor's Property Including Rights of Contribution |
|---|---|---|---|
| March 2003 | 60,164,000.00 | 14,916,000.00 | 75,080,000.00 |
| April 2003 | 63,100,000.00 | 7,513,000.00 | 70,613,000.00 |
| May 2003 | 61,031,000.00 | 4,599,000.00 | 65,630,000.00 |
| June 2003 | 52,518,000.00 | 2,332,000.00 | 54,850,000.00 |
| July 2003 | 62,092,000.00 | 1,360,000.00 | 63,452,000.00 |
| August 2003 | 61,835,000.00 | 1,299,000.00 | 63,134,000.00 |
| Sept. 2003 | 58,997,000.00 | 1,181,000.00 | 60,178,000.00 |
| Oct. 2003 | 56,499,000.00 | 1,270,000.00 | 57,769,000.00 |
| Nov. 2003 | 59,077,000.00 | 1,206,000.00 | 60,283,000.00 |
| Dec. 2003 | 52,750,000.00 | 83,000.00 | 52,833,000.00 |

Finally, the following chart shows the difference between the total value of the Debtor's property, including its rights of contribution, to the debt that property secured–i.e., the equity in the collateral–during the relevant periods:

| Date | Total Value of the Debtor's Property Including Rights of Contribution | Entire Balance of the Lehman Loan | Equity or <Deficiency> |
|---|---|---|---|
| January 2002 | $156,335,000.00 | $138,753,000.00 | $17,582,000.00 |
| February 2002 | 152,638,000.00 | 132,622,000.00 | 20,016,000.00 |
| March 2002 | 134,673,000.00 | 112,452,000.00 | 22,221,000.00 |
| April 2002 | 152,666,000.00 | 131,903,000.00 | 20,763,000.00 |
| May 2002 | 144,513,000.00 | 119,970,000.00 | 24,543,000.00 |
| June 2002 | 138,766,000.00 | 114,036,000.00 | 24,730,000.00 |
| July 2002 | 144,186,000.00 | 118,577,000.00 | 25,609,000.00 |
| August 2002 | 127,449,000.00 | 104,602,000.00 | 22,847,000.00 |
| Sept. 2002 | 103,330,000.00 | 90,163,000.00 | 13,137,000.00 |
| Oct. 2002 | 105,383,000.00 | 96,509,000.00 | 8,874,000.00 |

| Date | Total Value of the Debtor's Property Including Rights of Contribution | Entire Balance of the Lehman Loan | Equity or <Deficiency> |
|---|---|---|---|
| Nov. 2002 | 101,653,000.00 | 92,307,000.00 | 9,346,000.00 |
| Dec. 2002 | 84,747,000.00 | 82,589,000.00 | 2,158,000.00 |
| January 2003 | 83,081,000.00 | 82,311,000.00 | 770,000.00 |
| February 2003 | 87,722,000.00 | 86,844,000.00 | 878,000.00 |
| March 2003 | 75,080,000.00 | 80,869,000.00 | <5,789,000.00> |
| April 2003 | 70,613,000.00 | 79,197,000.00 | <8,584,000.00> |
| May 2003 | 65,630,000.00 | 76,426,000.00 | <10,796,000.00 |
| June 2003 | 54,850,000.00 | 67,160,000.00 | <12,310,000.00> |
| July 2003 | 63,452,000.00 | 77,716,000.00 | <14,264,000.00> |
| August 2003 | 63,134,000.00 | 77,592,000.00 | <14,458,000.00> |
| Sept. 2003 | 60,178,000.00 | 74,922,000.00 | <14,744,000.00> |
| Oct. 2003 | 57,769,000.00 | 72,717,000.00 | <14,948,000.00> |
| Nov. 2003 | 60,283,000.00 | 76,170,000.00 | <15,887,000.00> |
| Dec. 2003 | 52,833,000.00 | 70,077,000.00 | <17,244,000.00> |

Exhs. D-1, D-2, D-024.

Based on the foregoing, the Court finds that on and after March 1, 2003, there was no equity in the Debtor's property and that the Lehman Loan lien fully encumbered the Debtor's property. Thus, no "asset" was "transferred" as those terms are used under TUFTA, in any conveyance made by the Debtor on or after March 1, 2003. With respect to the conveyances prior to that date, the Court finds that there was equity in the Debtor's property, the Debtor's property was therefore not fully encumbered and, thus, the conveyances were "transfers" of "assets" under TUFTA.

### Preliminary Issue III
### Insolvency

Defendants argue that, for a number of reasons, the Trustee did not establish that the Debtor was insolvent as both § 24.005 and § 24.006 require.

The first of the Defendants' arguments is based on the statutory definition of insolvency, and much of the above discussion on the "lien issue" applies to that argument. Specifically, TUFTA provides that "a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Tex. Bus. & Com. Ann. § 24.003(a). This definition captures the concept of "asset," which by definition (as discussed above) does not include "property to the extent it is encumbered by a valid lien." Tex. Bus. & Com. Ann. § 24.002(2). The incorporation of the definition of "asset" in the definition of insolvency under TUFTA is repeated (and thus confirmed, argues the Defendants) under subsection (e) of § 24.003 where it says that "[d]ebts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." The Defendants incorporate their argument above and contend that this "plain language" in the statute necessarily leads to the conclusion that, to the extent the lien fully encumbered all property of the Debtor, it could not have been "insolvent" because it had neither "debts" nor "assets" as TUFTA defines those terms.

The starting point of this argument is the Defendants' argument on the "lien issue" discussed above. As noted above, the Court has determined that for the period from January 2, 2002 to March 1, 2003, the Debtor had equity in its property and therefore had "assets." Thus, the Defendants' argument that the Debtor could not as a matter of law have been insolvent because it had no "assets" (and thus no "debts") fails in its premise as to that period, and so the Court must determine whether in fact the Debtor was insolvent during this period.

With respect to the period on and after March 1, 2003, the Court has found that the lien securing the Debtor's Guarantee of the Lehman Loan did fully encumber all of the Debtor's property, and therefore the Debtor's conveyances on and after that date were not "transfers" of "assets" under TUFTA. The Court need not decide for that period whether the Debtor was insolvent for purposes of the statute. Out of an abundance of caution and for the sake of completeness, however, it will address the Defendants' legal argument and also examine the facts to also determine whether the Debtor was insolvent on and after March 1, 2003.

First, as pointed out by the Trustee, the Defendants' legal reasoning is flawed because debts are excluded from the insolvency calculation only to the extent they are "*secured* by a valid lien on property of the debtor not included as an asset." Therefore, unsecured debt is clearly not excluded from the calculation. A debtor with $1.00 in "debt" and which has $0.00 in "assets" is clearly "insolvent." Thus, even if the Debtor's liability on the Lehman Loan, and the property that secured it, were ignored for purposes of determining solvency under Tex. Bus. & Com. Code Ann. § 24.003(a), so long as it had unsecured liabilities, "the sum of the [D]ebtor's debts [wa]s greater than all of the [D]ebtor's assets at a fair valuation" and so it would have been insolvent.

At trial, the Court was presented substantial evidence that the Debtor was insolvent or on the verge of insolvency in 2001, became insolvent no later than June of 2002, and remained insolvent at all times thereafter. That evidence includes the Debtor's financial statements and testimony from both expert witnesses.

Both experts agreed that the Debtor was at least in the zone of insolvency by December 2001. Prior to that date, the testimony conflicts, or at least can be said to differ, on when the Debtor became insolvent. Mr. Alexander testified that the Debtor became insolvent by June 2002 when the Debtor's cash outflow started to exceed its inflow and remained insolvent at all times thereafter. Although Mr. Wheeler testified that if insolvency was measured by the Debtor's being unable to make payments to its creditors as they came due, then the Debtor was not insolvent, he did not dispute Mr. Alexander's determination based on the financial statements of the Debtor that the Debtor was insolvent, and he testified himself that the Debtor was insolvent as early as September of 2001. Further, Mr. Wheeler also testified that if the definition of insolvency under the law included a definition that assets were not included to the extent they were encumbered by a valid lien, his insolvency determination might be altered, although he did not quantify how, or by how much, it would have changed.

Moreover, there was no dispute that the Debtor's balance sheets through December of 2003 accurately reflected its liabilities other than its liability under the Guarantee of the Lehman Loan. *See* Exhs. D-1, D-2, line 338. When these figures are compared to the equity available in the Lenders' collateral (as calculated above), it is clear that the Debtor was insolvent throughout the period during which the challenged transfers occurred.

| Date | Equity or <Deficiency> | Liabilities Other Than the Debtor's Proportionate Share of the Lehman Loan | Solvency or <Insolvency> |
|---|---|---|---|
| Jan. 2002 | $17,582,000.00 | $21,919,000.00 | <$4,337,000.00> |
| Feb. 2002 | 20,016,000.00 | 25,085,000.00 | <5,069,000.00> |
| March 2002 | 21,770,000.00 | 26,868,000.00 | <5,098,000.00> |
| April 2002 | 20,766,000.00 | 25,942,000.00 | <5,176,000.00> |
| May 2002 | 24,543,000.00 | 29,884,000.00 | <5,341,000.00> |
| June 2002 | 24,730,000.00 | 29,417,000.00 | <4,687,000.00> |
| July 2002 | 25,609,000.00 | 29,445,000.00 | <3,836,000.00> |
| Aug. 2002 | 22,847,000.00 | 25,958,000.00 | <3,111,000.00> |
| Sept. 2002 | 13,167,000.00 | 17,693,000.00 | <4,526,000.00> |
| Oct. 2002 | 8,874,000.00 | 13,624,000.00 | <4,750,000.00> |
| Nov. 2002 | 9,346,000.00 | 13,614,000.00 | <4,268,000.00> |
| Dec. 2002 | 2,158,000.00 | 7,201,000.00 | <5,043,000.00> |
| Jan. 2003 | 770,000.00 | 6,337,000.00 | <5,567,000.00> |
| Feb. 2003 | 878,000.00 | 6,706,000.00 | <5,828,000.00> |
| March 2003 | <5,789,000.00> | 5,487,000.00 | <11,276,000.00> |
| April 2003 | <8,584,000.00> | 6,300,000.00 | <14,884,000.00> |
| May 2003 | <10,796,000.00> | 4,217,000.00 | <15,013,000.00> |
| June 2003 | <2,310,000.00> | 3,386,000.00 | <5,696,000.00> |
| July 2003 | <14,264,000.00> | 8,151,000.00 | <22,415,000.00> |
| Aug. 2003 | <14,458,000.00> | 7,956,000.00 | <22,414,000.00> |
| Sept. 2003 | <14,744,000.00> | 4,573,000.00 | <19,317,000.00> |
| Oct. 2003 | <14,948,000.00> | 4,367,000.00 | <19,315,000.00> |
| Nov. 2003 | < 5,887,000.00> | 3,430,000.00 | <19,317,000.00> |
| Dec. 2003 | <17,244,000.00> | 2,073,000.00 | <19,317,000.00> |

The Defendants did not rebut this evidence.  Rather, in their Rule 52(c) Motion, they challenged the Trustee's claim of insolvency only with the above legal argument, which the

Court has rejected.  The proof of insolvency at trial was uncontradicted and affirmatively established by the testimony of the Defendants' own expert witness.  The Court therefore finds that the Trustee sustained his burden of proving that the Debtor was insolvent at all relevant times.  Thus, for the period before March 1, 2003, the Defendants' Rule 52(c) Motion on this ground should be denied.  With respect to the period on and after March 1, 2003, even though the Debtor was solvent, the Rule 52(c) Motion should nevertheless be granted in light of the Court's previous ruling regarding the absence of a "transfer" under TUFTA during that period.

### The Trustee's Claims
### for Transfers Made with Actual Intent to Hinder, Delay or Defraud

In order to prevail on the fraudulent conveyance claims under TUFTA § 24.005(a)(1), the Trustee must prove that the Debtor made the transfers in question "with actual intent to hinder, delay or defraud any creditor" of the Debtor, Tex. Bus. & Com. Code Ann. § 24.005(a)(1), and "[i]ntent to hinder, delay or defraud may be established by circumstantial evidence." *In re GPR Holdings, L.L.C. v. Duke Energy Trading and Marketing, LLC (In re GPR Holdings, L.L.C.)*, No. 03-3430, 2005 WL 3806042, at *9 (Bankr. N.D. Tex. May 27, 2005)(citing *Sherman v. FSC Realty, LLC (In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 262-63 (Bankr. N.D. Tex. 2003)); *see also In re Reed*, 700 F.2d 986, 991 (5th Cir. 1983).  Circumstantial evidence of actual fraudulent intent under TUFTA, "commonly known as 'badges of fraud'" are codified in a non-exclusive list set forth in § 24.005(b) of TUFTA.  *In re Soza*, 542 F.3d 1060, 1066 (5th Cir. 2008).  That section provides:

> In determining actual intent under Subsection (a)(1) of this section, consideration may be given, among other factors, to whether:
>
> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after a substantial debt was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Tex. Bus. & Com. Code Ann. § 24.005(b).

The intent that is required is not the same intent that is necessary to support an action for fraud. *See Nobles v. Marcus*, 533 S.W. 2d 923 (Tex. 1976) (Fraud and fraudulent transfer are distinct causes of action.). Rather, the intent required under TUFTA is simply the intent to hinder, delay or defraud a creditor by putting assets beyond that creditor's reach. *In re Reed*, 700 F. 2d 986, 991 (5th Cir. 1983). Further, the statute expressly authorizes avoidance of any transfer made with intent to hinder, delay or defraud "any creditor" of the debtor. Tex. Bus. & Com. Code Ann. § 24.005(a)(1). The Trustee bears the burden of proof to show, by a preponderance of evidence, that the transfers in question were made by the Debtor with the actual intent to hinder, delay or defraud any creditor of Debtor. The Trustee may prove intent through either direct evidence or circumstantial evidence–i.e., by establishing sufficient badges of fraud that the fact-finder is satisfied that the requisite intent has been shown.

The Eighth Circuit has held that the party seeking to avoid a transfer must establish, by a preponderance of the evidence, the presence of multiple badges of fraud. Once that occurs, the burden shifts to the defendant to show, again by a preponderance of the evidence, that the defendant had a legitimate purpose in making the transfer. *Kelly v. Armstrong*, 141 F.3d 799, 802-03 (8th Cir. 1998). In *Kelly* the court stated:

Kelly [the trustee] argues that the district court erred in failing to instruct the jury that, if it were to find multiple badges of fraud with regard to any transfer, the burden would shift to the defendants to establish a legitimate supervening purpose for making the transfer. The district court instructed the jury that it could "give

> the presence or absence of [badges of fraud] such weight as [the jury thought] the[ir] presence or absence deserve[d]." Kelly contends that the common law of fraudulent conveyances shifts the burden of both production and persuasion to the defendants once multiple badges of fraud have been established, and furthermore, that Federal Rule of Evidence 301 should not be applied to change this allocation of burden. We agree.

*Id.* at 802 (footnote omitted, bracketed portions in original). As the *Kelly* court further explained:

> The instruction given by the district court-that badges of fraud, if found, could be given whatever weight the jury thought they warranted-could potentially have resulted in the jury's improper allocation of the burden of proof. As the case was submitted, the jury was free to return a verdict in favor of defendants, despite finding the existence of multiple badges of fraud and disbelieving the defendants' explanations for the transfers. The district court's failure to instruct the jury properly regarding the burden of proof constitutes reversible error.

*Id.* at 803; *see also Acquia*, 34 F.3d 806 [O]nce a trustee establishes indicia of fraud in an action under §548(a)(1), the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue."); *Crawforth v. Bachman (In re Bachman)*, Adv. No. 06-6027, 2007 WL 4355620, at *15 (Bankr. D. Idaho December 10, 2007) (failure "to show a legitimate supervening purpose for the transfers," in the face of multiple badges of fraud means the trustee may avoid transfers).

The presence of many badges of fraud "will always make out a strong case of fraud." *Walker v. Anderson*, 232 S.W. 3d 899, 914 (Tex. App.-Dallas 2007, no pet.). Proof of four to five badges of fraud has been found sufficient in several reported cases. *See, e.g., Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex. App.–Houston [14th Dist.] 2004, no pet.); *Tel Equip. Network, Inc. v. TA/Westchase Place, Ltd.*, 80 S.W.3d 601, 609 (Tex. App.–Houston [1st Dist.] 2002 no pet.).

As a matter of law, a finding of fraudulent intent cannot properly be inferred from the existence of just one "badge of fraud." *Diamant v. Sheldon L.Pollock Corp.*, 216 B.R. 589 (Bankr. S.D. Tex. 1995) ("[O]ne badge of fraud standing alone may amount to little more than a suspicious circumstance, insufficient in itself to constitute fraud per se.") (quoting *U.S. Fernon*, 640 F.2d 609, 613 (5th Cir. 1981)); *Walker v. Anderson*, 232 S.W.3d 899 at 914 ("An individual badge of fraud is not conclusive."); *G.M. Houser, Inc. v. Rodgers*, 204 S.W.3d 836 at 843 (stating same); *Roland v. U.S.*, 838 F.2d 1400, 1403 (5th Cir. 1988) (holding that an inference of fraud is proper only when several indicia are found).

52

To prevail specifically on his § 24.005(a)(2) and §24.006(a) TUFTA claims, the Trustee must demonstrate that the Debtor did not receive "reasonably equivalent value" in exchange for the transferred assets. Tex. Bus. & Com. Code Ann. §§ 24.005(a)(2), 24.006(a). "There need not be a dollar-for-dollar exchange to satisfy the reasonable equivalence test; rather, the Court should simply compare 'the value of what went out [of the debtor's estate] with the value of what came in.'" *In re Sullivan,* 161 B.R.776 at 781; *see also Smith v. Am. Founders Fin. Corp.,* 365 B.R. 647, 666 (Bankr. S.D. Tex. 2007); *WCC Holdings Corp. v. Tex. Commerce Bank-Houston, N.A.,* 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994); *Matter of Besing,* 981 F.2d 1488, 1495 (5th Cir. 1993). The Court will take this case law into consideration in its discussion of "reasonably equivalent value" below.

### Direct Evidence of Actual Intent

The Trustee asserts that there are two time periods during which the Debtor's actions prove its fraudulent intent: (1) the period from June 2002 through February 2003 (the "Early Wind-Down Period"); and (2) the period from March 1, 2003 to the end of 2003 (the "Post-Default Period"). The Court has previously found that during the Post-Default Period the Debtor had no "assets" that could be transferred. Because, as a matter of law, it therefore did not make any "transfers" of assets during the Post-Default Period, whether the Debtor had actual intent to hinder, delay or defraud its creditors during that time is immaterial. That said, however, out of an abundance of caution and for the purpose of completeness the Court will address the issue of intent during that period as well as during the prior period.

The Early Wind-Down Period

This period covers the bulk of the cash transfers alleged by the Trustee–of the approximately $41 million in transfers alleged by the Trustee, approximately $37 million was transferred during this period. He claims that there is considerable direct evidence of an intent to hinder, delay or defraud Flextronics during this period. Specifically, he points to facts surrounding a meeting of the board of directors of SMTC Corporate that apparently took place on June 4, 2002.

First, the Trustee relies on the May 22, 2002 email from Paul Walker in which he envisions closure of the Austin office in the third quarter of 2002, but notes that "[t]he actual

timing is not as important as determining the restructuring charges and balance sheet impact." Exh. P-80. The Trustee insists that this email, coupled with Phil Woodard's email of May 31, 2002, in which he includes as one of three suggested options for dealing with the Flextronics Lease, "bankrupting the Texas Company and walking away from the lease," as proof that early on there was a scheme in place to defraud Flextronics. The Trustee argues that a reasonable fact-finder could infer that Mr. Woodard's third option was adopted by the board of directors of the Debtor on June 4, 2002.

Next, the Trustee claims that the Defendants' failure to produce the June 4th board minutes during discovery, in spite of the Trustee's request, or to include them in their own trial exhibits leads to the conclusion that the minutes do not support Defendants' case. He reasons that, even if the minutes were completely silent on the Flextronics Lease, the Defendants would have offered them into evidence at least to show that the board had not adopted Mr. Woodard's third option. The Trustee argues that the emails among the executives in preparation for the board meeting and the inferences to be drawn from the Defendants' failure to produce or offer the minutes of the June 4th board meeting are more than sufficient to support a finding of actual intent to hinder, delay or defraud Flextronics during the Early Wind-Down Period.

The Post-Default Period

The Trustee claims there is overwhelming evidence that the Debtor's transfers after March 1, 2003 of cash (the Net Balance Transfer) and equipment (the Fixed Assets Transfers) were made with the actual intent to hinder, delay or defraud Flextronics.

First, he claims that the Debtor hindered a creditor when it stopped paying Flextronics in its ordinary course of business by failing to make the March 1, 2003 rent payment. The Trustee contends that the Defendants offered no legitimate reason for this, considering (1) the Debtor was bringing in more cash than it needed during this period, (2) the Debtor did not surrender the Lease to Flextronics until May 2003, three months after default, and (3) the Credit Agreement, rather than prohibiting payments to Flextronics, actually mandated the timely performance of all Debtor's contractual obligations, both material and lesser ones. Exh. P-9 (Les Alexander spreadsheet, showing roughly $4 million dollars in net cash being transferred to HTM during the Post Default Period), Exh. P-116 (letter surrendering property to Flextronics on May 22, 2003), and Exh. D-35, Sections 10.4 and 10.5 (covenants under Lehman Loan requiring Borrowers to

cause their subsidiaries, including the Debtor, to remain current on material obligations and "Contractual Obligations").

As further evidence, the Trustee points to the fact that in April 2003 the Debtor ceased recording the monthly rent obligation on its books, as if the Lease no longer existed, and argues that the cash management system operated like a vacuum cleaner during this period for SMTC Corporate, quietly and effectively removing all of the Debtor's cash from the Debtor's reach. Exh. D-2, line 104. He also cites the transfers by the Debtor in March and April of 2003 of allegedly valuable equipment to affiliates for no consideration, as additional evidence. During all these actions, the Trustee argues Mr. Walker stalled Flextronics with false representations that the Debtor was broke and had no assets. Exh. P-89.

It is undisputed that on April 2, 2003, during the Post-Default Period, the Debtor received Flextronics's demand letter. As of March 2003, the Debtor's balance sheet showed $20.6 million in total assets. Exh. D-2, line 324. Those assets consisted of $14.8 million in current assets (inventory and receivables) and $5.3 million in fixed assets. Exh. D-2, lines 311, 318. Following the default, in March and April 2003, the Debtor's fixed assets were transferred to sister companies, and by the end of 2003, the book value of the Debtor's assets was just $83,000. Exh. D-2.

In the Court's opinion, however, none of this "direct evidence" demonstrates that any of the challenged transfers were motivated by an intention to defraud Flextronics. None of the emails mention any transfers at all. The Trustee's Exhibits P-80 and P-82 do not show that any transfers were made with the intention of fraudulently removing assets from Flextronics's reach. Rather, those exhibits merely show that SMTC Texas executives considered closing the SMTC Texas operations in late May and early June of 2002 when many other competitors–including Flextronics–were also closing their Texas operations and moving manufacturing elsewhere. Thus, the Court finds that the Debtor's actions were made for legitimate business reasons as part of the Debtor's effort to operate in a tough economic climate for as long as possible and then to orderly shut down and not to defraud creditors.

The Trustee's argument may have more merit if the decision to close SMTC Texas had been made or even considered in May of 2002 but rather the evidence shows that, prompted by a further loss of business, that decision was made in early 2003. Exh. P-84, P-122. Mr. Hartstein

55

and Mr. Sommerville both testified that the decision to close the Debtor occurred in 2003 and resulted from a loss of business.

The emails also do not support the Trustee's contention that there was some general intent to defraud Flextronics. Mr. Hartstein testified regarding Exhibit D-322, a September 9, 2002 email from Scott Jensen of the Morse Company regarding Mr. Hartstein working with Morse to sell or lease the building. Mr. Hartstein testified that the email reflected some of the efforts the Debtor was making to sublet the building after the Dell disengagement. The fact that Mike Carney of Flextronics was copied on that email is evidence that nothing was concealed from Flextronics and that the Debtor was attempting to avoid defaulting on the Lease by looking for other means of paying Flextronics.

The Trustee's conclusion that the board, at a meeting that presumably took place in June 2002, adopted Mr. Woodard's third option of putting the company into bankruptcy and walking away from the Lease is not direct evidence of fraud, but can only be inferred from the facts the Trustee cites and the Court refuses to do so. Mr. Woodard did not testify, and the Court cannot glean Mr. Woodard's actual intent from an email. Moreover, a decision to file bankruptcy does not always equate with an intent to defraud a creditor. *See Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007). Mr. Hartstein expressly testified that Mr. Walker did not want to bankrupt the Debtor. Furthermore, the actual bankruptcy decision was made well after Mr. Walker and Mr. Woodard had left the company. Exh. P-124; Exh. D-358. Finally, in a later email Mr. Woodard discusses a possibility of settling with Flextronics. Exh. P-83.

The testimony and other evidence reflects that the Debtor's operations were disintegrating. Most all of the fabrication was being outsourced to Mexico where labor was less expensive. Flextronics knew this. Flextronics was also affected by the downturn. *See* Newspaper Articles, *supra*. The Debtor had disengaged from Dell in May 2002 due to the difficulty the Debtor experienced in dealing with Dell and its oppressive pricing mandates. As its operations slowed, the Debtor's cash needs logically would have begun to decrease. From the emails, it appears that even after the Debtor disengaged with Dell, it was attempting to stay in business and that Alcatel was still a substantial customer. In later emails between Paul Walker and John Sommerville, it appears Alcatel's ultimate decision to move the rest of its production to Nogales, Mexico precluded any opportunity the Debtor might have had to restructure its business and maintain ongoing operations in Austin.

56

In addition, the Debtor paid its rental obligations each month as it started its shutdown process. The security deposit of $475,000.00 satisfied the March and April 2003 rent. The Debtor paid all of its other expenses prior to shutdown except the debts represented by the few proofs of claims filed in the bankruptcy case, which debts were actually incurred or came due after the Debtor surrendered the premises.

In light of all this evidence, the Court cannot conclude from the emails that the Debtor intended to shut down its operations immediately and to systematically transfer all of its assets, all to the detriment of Flextronics.

Rather, SMTC Corporate evaluated its costs to shut down and determined it would handle the Lease obligation separately through some type of settlement negotiations. The Lease was a substantial burden to the Debtor because there were eight years remaining on it at the time of the shutdown. The evidence reflects that Paul Walker and Phil Woodard thought a settlement with Flextronics was possible. Paul Walker initiated settlement discussions with Flextronics by offering it the land the Debtor owned because he believed the Lenders would release their lien on the land to allow for such settlement.

The Trustee claims Paul Walker lied to Mike Carney of Flextronics when he said the Debtor was a stand-alone entity with no assets to speak of. The Court does not know what Mr. Walker thought because he did not testify, nor did Mr. Woodard or Mike Carney of Flextronics testify. Thus, it is equally likely that Paul Walker believed the Debtor had no assets, because these assets were encumbered by liens securing the Lehman Loan, including deed of trust liens on the Debtor's real property. It is also possible that Paul Walker believed that Flextronics would have to mitigate its damages, either by reletting or selling the building.

Finally, Flextronics requested that SMTC Corporate sign a parent company guaranty in March 2003 after a financial review of the Debtor. Exh. P- 86. Why Flextronics had not required a guaranty when the Lease was executed, or earlier during the economic downturn, was not established at trial. Flextronics also occupied the building upon the Debtor's surrender and eventually sold the building in August 2005 for $8.25 million, an amount that would have substantially reduced, if not eliminated, Flextronics's damages from the Debtor's breach of the Lease. Exh. D-326; Exh. D-277.

In summary, the evidence the Trustee claims directly establishes actual fraudulent intent lacks probative force. He has therefore failed to establish by direct evidence that the Debtor actually intended to hinder, delay or defraud Flextronics.

Circumstantial Evidence of Actual Intent:<br>Badges of Fraud on Claim Category 1: The Intercompany Transfers

The Trustee alleges that, in a series of monthly transactions from February 2002 to June 2002, the Debtor transferred to SMTC Charlotte a total of $104,646.00, and from February 2002 to February 2003 it transferred to SMTC Mex/SMTC Chihuahua cash totaling approximately $37 million, all without the Debtor receiving reasonably equivalent value.

Badge of Fraud 1: Transfers made to insiders or obligations to insiders incurred

Yes. There is no dispute that these transfers were made by the Debtor to SMTC Mexico and SMTC Charlotte and that both entities were insiders of the Debtor.

Badge of Fraud 2: The debtor retained possession or control of the property transferred after the transfer

No. The Debtor did not retain possession or control. In fact, the Debtor received product from Mexico and Charlotte for the payments it made. Once the product was received, it was then sold to Dell or other customers at a slight markup.

Badge of Fraud 3: The transfer or obligation was concealed

No. It appears these transfers were in the ordinary course of the Debtor's business. The Debtor was operating in 2002 and needed to purchase most of the products from Mexico at a lesser cost to insure that it could continue to sell inventory to Dell while disengaging. *See* Newspaper Articles, *supra*. The Defendants produced extensive documentation with respect to these transfers, not to mention countless witnesses who testified to the validity of these transactions. In addition, the Trustee's own expert acknowledged that the Debtor had provided for these transactions on its books and that he had treated them, for purposes of his expert opinion, as transactions in the ordinary course of the Debtor's business.

Badge of Fraud 4: Before the transfer was made or obligation was incurred, the debtor had been threatened with suit

No. The Debtor was not sued until after it had shut down in May 2003. The Debtor continued to pay its operating expenses throughout 2002 and into 2003.

Badge of Fraud 5: The transfer was of substantially all the debtor's assets

No. The Debtor received product in return for the payments made to Mexico and Charlotte which product it in turn sold to its customers. The Debtor continued to reflect significant assets on its books through March 2003. Exh. D-2, line 324.

Badge of Fraud 6: The debtor absconded

No. The Debtor ultimately closed its doors but not until May 2003. These transfers occurred in 2002 and early 2003 while the Debtor was still operating its facility.

Badge of Fraud 7: The debtor removed or concealed assets

No. This does not appear to be the case and there was no testimony to this effect. In fact, the witnesses testifying in connection with these transactions all confirmed that these transfers were spurred by Dell's requirement that the Debtor lower its costs—evidence that these transactions were made in the ordinary course of business for a legitimate business purpose and not concealed from anyone. These transactions were accounted for not only on the financial books and records of the Debtor, but also the books and records of SMTC Charlotte and SMTC Mex.

Badge of Fraud 8: The value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred

Yes. The only evidence presented supports the Debtor's receipt of reasonably equivalent value. The evidence and testimony presented at trial showed that the manufacture of Dell products was transitioned from the Debtor to SMTC Mex/Chihuahua beginning in 2001. The uncontroverted testimony of Messrs. Hartstein, Sommerville, Hart, Rossi, and Skerjl and Mses. Carbajal and Markland is that this transition occurred because the Debtor could not manufacture the products at the low rates Dell demanded and the cheaper labor in Mexico allowed for such cost savings. Similarly, all the witnesses testified that although the Dell production shifted to SMTC Mex, the Debtor continued to be Dell's customer contact and managed the Dell account until the Debtor had fully disengaged with Dell. These witnesses testified that SMTC Texas was purchasing the Dell production from SMTC Mex, which the Debtor then sold to Dell.

Further, the Defendants presented a multitude of documents evidencing the transfer of Mexican manufactured goods from SMTC Mex to the Debtor in exchange for the challenged payments. Exh. D-40 through D-68. These documents included the following:

1. voucher checks listing all of the Mexican invoices paid by said check and the accompanying facsimile cover sheets evidencing the exchange of these documents

between SMTC Texas and SMTC Mexico's respective accounting departments, *see e.g.* Exh. D-68, Bates Nos. Resp. SMTC 04842-04849;

2. the Mexican invoices paid by these checks, *see e.g.* Exh. D-41, Bates No. Resp. SMTC 68906;

3. documents evidencing the passage of these goods through Mexican customs, *see e.g.* D-41, Bates No. Resp. SMTC 68901-68902; and

4. freight documents evidencing delivery to SMTC Texas's leased facility, *see e.g.* Exh. D-41, Bates No. Resp. SMTC 68903.

Documentary evidence was also presented regarding the transfers to SMTC Charlotte, including the following:

1. voucher checks listing all of the SMTC Charlotte invoices paid by said check and the accompanying facsimile cover sheets evidencing the exchange of these documents between SMTC Texas and SMTC Charlotte's respective accounting departments, *see e.g.* Exh. D-68, Bates No. Resp. SMTC 04834-04835;

2. the pertinent SMTC Charlotte invoices paid by these checks, *see e.g.* Exh. D-56, Bates No. Resp. SMTC 68906; and

3. stamped invoices, packing slips and shipping memo evidencing the delivery of the SMTC Charlotte-manufactured goods to SMTC Texas, *see e.g.* Exh. D-56, Bates No. Resp. SMTC 74382-74385; Exh. D-56, Bates No. SMTC 08273.

Ms. Markland, who worked with the Debtor's accounts payables department, testified that the Debtor would never have paid SMTC Mex or SMTC Charlotte for something it did not receive because the computer system would not permit accounts payable personnel to pay an invoice without the respective product having been received in the warehouse and processed in the computer by the materials personnel in the warehouse. Ms. Markland also testified that the Debtor's personnel who processed the receipt of inventory from SMTC Mex and SMTC Charlotte would not be the same SMTC Texas personnel who processed the invoices and payments.

Similarly, Ms. Carbajal, the controller of SMTC Mex responsible for the issuance of the invoices at issue and the processing of the checks from the Debtor, testified that it was impossible for an invoice to issue without goods having shipped: that the computer system would not permit SMTC Mex accounts receivable personnel to issue an invoice to the Debtor unless the SMTC materials personnel had first processed the shipment of the goods in the system. Ms. Carbajal further testified that the SMTC Mex warehouse personnel processing the shipment of goods would not be the same accounting personnel processing the invoices.

Ms. Markland testified that if the invoice did not match up with the receipt of inventory, the invoice would not be paid but would be set aside and disputed with SMTC Mex. Ms. Carbajal confirmed that the Debtor could and would dispute any invoices which did not comport with their inventory receipts recorded in the computer.

The testimony of Mr. Rossi, Ms. Carbajal and Ms. Markland all indicate the Debtor received value for the product it purchased. And, the Trustee's own expert assumed reasonably equivalent value regarding these transactions in preparing his report. There was absolutely no testimony illicited from anyone that in any way proves value not reasonably equivalent.

The Trustee presented no evidence to contradict the Debtor's receipt of finished goods from SMTC Mex. Although Mr. Alexander speculated that there may have been fraud considering there were documents missing that would have evidenced the shipment from the SMTC plant in Chihuahua to the shipping facility in El Paso, his opinion was countered by Mr. Desai's credible explanation that Chihuahua used its own trucks to transport the goods from its plant in Mexico to El Paso, and thus there were no outside shipping companies used that would have generated such documents.

Further, the Trustee has presented no evidence that SMTC Texas paid more for the goods than their reasonable value. Mr. Hartstein even testified that the product prices were increased for sale to Dell, which could mean that the Debtor paid less for the goods than what the Debtor received on the market for the same goods. Ms. Carbajal testified that SMTC Mex actually lost money on the Dell production, further evidencing Dell's low price requirements or the low prices offered to the Debtor.

The Trustee also seems to argue that papering these transactions by dummy checks between sister companies somehow proves that these transactions were fraudulent and not for reasonably equivalent value. Most, if not all, of the testimony from the Debtor's former employees indicates that these intercompany transactions were a normal part of business for the Debtor, its affiliates, and parent. The Trustee's own expert did not question the dummy checks as being fraudulent. He had actually followed the postings of the underlying transactions evidenced by the dummy checks in the Debtor's accounting ledgers and was satisfied that such were accounted for.

Badge of Fraud 9: The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred

Yes. The North Carolina transfers took place from February 2002 to June 2002. The Mexico transfers occurred from June 2002 to February 2003. The Trustee's expert testified that the Debtor was insolvent by June 2002. The Court has found above that the Debtor was insolvent during the entire period these transfers occurred.

Badge of Fraud 10: The transfer occurred or the obligation was incurred shortly before or shortly after a substantial debt was incurred

No. The Debtor entered into the Lease with Flextronics on September 1, 2001 and the Debtor continuously paid its monthly rent to Flextronics until March, 2003. The Intercompany Transfers occurred from February 2002 to February 2003 meaning these transfers commenced five to six months after the Debtor entered into the Lease. There was no evidence of any other substantial incurrence of debt.

Badge of Fraud 11: The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor

No. This badge is not applicable.

Summary: Badges of Fraud on the Intercompany Transfers

The Court can find the existence of one, maybe two badges of fraud which is insufficient proof for a finding of actual intent to hinder or delay. Based on the economic circumstances of the technology sector at this time, the continued outsourcing to less costly countries, and the Debtor's need to satisfy its largest customer, there is no basis to rule for the Trustee. The Trustee did not provide evidence with regard to these transactions other than that they were made to an insider and some were made when the Debtor was insolvent. The Trustee has not demonstrated by a preponderance of the evidence the presence of multiple badges of fraud and therefore fails in his burden. Further, the Defendants have provided overwhelming evidence that these transfers were made in good faith, for reasonably equivalent value, and for a legitimate business purpose.

Circumstantial Evidence of Actual Intent:
Badges of Fraud on Claim Category 2: The Expense Reallocations

The Trustee alleges that on September 29, 2002, SMTC Corporate recorded expenses of approximately $750,000 to a Corporate Reallocation Account of the Debtor and $1,138,000 to a Sales and Marketing Reallocation Account of the Debtor, and that after September 2002, it recorded additional "Corporate Reallocation" charges of $19,000 (in October), $34,000 (in

November), $36,000 (in December), and $23,000 (in January of 2003).  For each of these obligations incurred by the Debtor, the Trustee contends there was no reasonably equivalent value given it in return.  Exh. D-2, lines 200 and 222.

Badge of Fraud 1: Transfers made to insiders or obligations to insiders incurred

Yes.  There is no dispute that the reallocations were made on the books of the Debtor in September 2002. This is actually a transfer of an expense item to the Debtor for services provided to the Debtor by SMTC Corporate.  The Court concludes these were obligations incurred to an insider for purposes of TUFTA.

Badge of Fraud 2: The debtor retained possession or control of the property transferred after the transfer

No.  This badge is inapplicable.  These were reallocations of expenses to pay for or to correct the amount owed for services previously provided by SMTC Corporate to the Debtor. Thus, they were obligations incurred and not transfers of assets.

Badge of Fraud 3: The transfer or obligation was concealed

No.  It appears that the reallocations were made from September 2002 through January 2003, at a time when the Debtor was still in operation and paying its daily expenses and that the allocations were reflected on the Debtor's financial statements.

Badge of Fraud 4: Before the transfer was made or obligation was incurred, the debtor had been threatened with suit

No.  The Debtor was not sued until after it had shut down in 2003.  Also, the Debtor in 2002 was still paying its monthly expenses including its monthly rent to Flextronics.

Badge of Fraud 5: The transfer was of substantially all the debtor's assets

No.  The Expense Reallocations did not involve transfers of assets, but rather the incurrence of obligations.  Moreover, while the Expense Reallocations significantly affected the Debtor's net income in September 2002, making it a negative number (<$1.415 million>) for the month of September, the Debtor still had substantial assets as of September 2002 ($38.296 million) so even if the Expense Reallocations  were considered transfers of assets, they were not transfers of substantially all of the Debtor's assets.  Exh. D-2, lines 271, 324.

Badge of Fraud 6: The debtor absconded

No.  This badge does not appear to apply to a corporate expense reallocation.  The Debtor did ultimately close its doors but not until mid-2003.  The reallocations occurred from September 2002 to January of 2003.

Badge of Fraud 7: The debtor removed or concealed assets

No. This does not appear to be the case, and there was no testimony that these Expense Reallocations were concealed. They are disclosed in the financial records of the Debtor.

Badge of Fraud 8: The value of the consideration received by the debtor was reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred

Yes. As attested by the uncontroverted testimony of multiple witnesses at trial, the services covered by these charges included marketing and sales services, training, information technology services, or other services that benefitted the company as a whole and would have been incurred by the subsidiary individually had SMTC Corporate not provided the services. As shown by the testimony of Mr. Skerlj and Ms. Todd, the allocations were uniformly made using a formula approved by the companies' auditors, KPMG. Exh. D-239. Allocations were made to all of the subsidiaries.

Mr. Wheeler also verified that there are tax regulations that govern the allocation of expenses among subsidiaries and that one of the Internal Revenue Code provisions in particular, 26 U.S.C. § 482, requires this allocation so that one or more subsidiaries cannot manipulate their income to reduce taxes in one taxing district at the expense of another. Mr. Wheeler explained that when an affiliate renders services to another, the affiliate receiving the services must accrue that liability whether it is recorded on its books timely or not. He regarded the reallocations in September 2002 as catch up allocations, properly made and that they were settling an already accrued liability of the Debtor. He further explained that it would not have been proper for SMTC Texas to not book such a liability, and it would not have been proper to operate without recognizing it as an expense of the Debtor. There was no controverting testimony on this issue.

"Value is given for a transfer or an obligation if, in exchange for the transfer or obligation . . . an antecedent debt is . . . satisfied." Tex. Bus. & Com. Code Ann. § 24.004(a). The Trustee claims that intangible, non-economic benefits do not constitute value, citing to *In re Hinsley,* 201 F. 3d 638 (5th Cir. 2000), and that the evidence at trial does not support the existence of an antecedent debt. The Trustee asserts that there was no existing written agreement between the Debtor and SMTC Corporate to pay for those services and because the services were provided by the Debtor's parent, it is not reasonable to infer an expectation of payment. *See generally Matter of Multiponics, Inc.,* 622 F. 2d 709, 717 n.8 (5th Cir. 1980)(discussing various factors considered by courts in determining whether advances are loans or capital); *Matter of Transystems, Inc.,* 569 F.2d 1364, 1370 (5th Cir. 1978) (holding that would-be insider "loans"

should be closely scrutinized, and determining that the parent's past advances had been working capital advances as opposed to loans). Because there was no agreement or understanding that the Debtor would pay for these services, the Trustee claims no value is put into the estate for such reallocations. Based on the testimony regarding the tax and accounting reasons for reallocation of expenses among subsidiaries, the Court finds ample basis for imposing on the Debtor its share of such expenses. Thus, the Court does not agree with the Trustee's argument.

The definition of "reasonably equivalent value" includes payment for services previously provided. *See, e.g., Morris v. Nance*, 888 P.2d 571, 579 (Or. App.–1994) ("Because defendant's past services constitute reasonably equivalent value, plaintiff's claims alleging constructive fraud are without merit."). "An antecedent debt owed by the debtor occurs when a right to payment arises–even if the claim is not fixed, liquidated or matured." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 511 (3d Cir. 1999); *see also In re Bennett Funding Group, Inc.*, 220 B.R. 739, 742 (2d Cir. BAP 1998) ("'[A]n antecedent debt' is a pre-existing debt that was incurred when the debtor previously obtained a property interest in the consideration provided by the creditor that gave rise to the debt."). The right to payment generally arises when the debtor obtains the goods or services." *First Jersey*, 180 F. 3d at 511. "[L]egal claims arise when the legal services are performed, not when the bill itself is presented to the client." *Id.* "'Debt' means a liability on a claim." Tex. Bus. & Com. Code Ann.§ 24.002(5).

Thus, the Court finds that the Trustee provided no controverting evidence that the services provided to the Debtor were not performed by SMTC Corporate nor did he provide any evidence that the value of services provided were not reasonably equivalent to the allocations made. The retroactive cost allocations satisfied an antecedent debt owed by the Debtor to SMTC Corporate, and equivalent value was received.

Badge of Fraud 9: The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred

Yes. As discussed in detail above, the Court finds that the Debtor was insolvent during the time these reallocations were made from September 2002 through January of 2003.

Badge of Fraud 10: The transfer occurred or the obligation was incurred shortly before or shortly after a substantial debt was incurred

No. The Debtor executed the Lease with Flextronics in September 2001. These costs reallocations occurred one year later starting in September 2002. This was not shortly before nor shortly after the Debtor executed the Lease.

Badge of Fraud 11: The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor

No. This badge is inapplicable.

Summary: Badges of Fraud on the Expense Reallocations

In summary, the Trustee has failed to carry his burden in connection with the expenses that were reallocated, as at most only two badges of fraud can be found. In contrast, the Defendants have provided overwhelming and uncontroverted evidence that these cost reallocations were done for legitimate business purposes, and that the Debtor received reasonably equivalent value for the expenses allocated to its books.

Circumstantial Evidence of Actual Intent:
Badges of Fraud on Claim Category 3: The Net Balance Transfers

The Trustee alleges that between January 2002 and December 2003, the daily cash transfers from the Debtor to HTM exceeded the amount of cash transferred from HTM to the Debtor during the same period by approximately $41 million and therefore reasonably equivalent value was not given. The Court has previously found that on and after March 1, 2003, the Debtor had no "assets" that could have been transferred and so for that reason the cash transfers made after that date ($3.9 million, according to the Trustee) are not avoidable. However, out of an abundance of caution and for the sake of completeness, all of the transactions of which the Net Balance Transfer is comprised, without regard to their timing, will be addressed below.

There is no dispute that the SMTC entities had an elaborate cash management system centralized at HTM's level. Pursuant to that system all customer product receipts from the different operating subsidiaries were deposited into a lockbox and swept each night to pay down the Lehman Loan. HTM would then provide funds the next day to each subsidiary to pay its operating expenses. The Trustee does not find fault with this system per se. Instead, the Trustee claims that once SMTC Corporate decided to disengage from Dell, close down the Debtor, and default on the Flextronics Lease, this centralized cash management system provided a sinister mechanism to siphon off any additional cash that otherwise the Debtor might have to pay its creditors.

The Trustee contends that, over the period from May 2002 to March 2003, $38 million net in cash was transferred to HTM. Then, on March 1, 2003, SMTC stopped making payments and defaulted on the Flextronics Lease. According to the Trustee, an additional $3.9 million in

66

cash was transferred between March 2003 and December 2003 through the cash management plan.

Badge of Fraud 1: Transfers made to insiders or obligation to insiders incurred

Yes.  All of the cash transfers were swept to an account held by HTM, an insider of the Debtor.

Badge of Fraud 2: The debtor retained possession or control of the property transferred after the transfer

No.  The Debtor did not retain possession or control of the property.  The funds were swept each night to pay the Lehman Loan.  HTM would then call on the loan the next day to fund the next day's operations and would place other funds in the Debtor's disbursement account to enable the Debtor to pay its expenses.

Badge of Fraud 3: The transfer or obligation was concealed

No.  These cash transfers were accounted for in the Debtor's bank records and in the general ledgers.

Badge of Fraud 4: Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit

No.  Prior to April 2, 2003, the Debtor had not been threatened with any suit.  On April 2, 2003, the Debtor received a demand letter from Flextronics to pay the rent due; however, even for cash transfers occurring after this date, the Court cannot find the Debtor had been sued or threatened with suit.  This factor is listed as a badge of fraud because the pendency of litigation implies fraudulent intent when the circumstances show that there is a causal connection between the threatened litigation or judgment and the transfer. *Dickinson v. Ronwin*, 935 S.W.2d 358, 364 (Mo. App. S.D. 1996) ("Conveyances made for the purpose of defeating an anticipated judgment in a case pending or about to be commenced are in fraud of creditors and void as to such plaintiff."); *see also Jacksonville Bulls Football, Ltd. v. Blatt*, 535 So.2d 626, 629 (Fla. Dist. Ct. App. 1988) ("[T]he mere fact that a suit is pending against a person, or that a person is indebted to another, does not in and of itself render fraudulent that person's conveyance of property.").

There is no evidence that the post-demand letter cash transfers were motivated by the desire to avoid paying a judgment to Flextronics.  To the contrary, there were legitimate reasons for this system and the preponderance of the evidence suggests that the Debtor continued to make

the cash transfers in the ordinary course of business as cash transfers had been made before the Debtor and Flextronics entered into the Lease as well as during the Lease term.

Badge of Fraud 5: The transfer was of substantially all the debtor's assets

No. After most of the cash transfers, the Debtor still retained other assets on its books. Exh. D-2, line 324.

Badge of Fraud 6: The debtor absconded

No. The Debtor finally closed its doors in mid-2003.

Badge of Fraud 7: The debtor removed or concealed assets

No. There was no testimony that these cash transfers were concealed. The transfers are clear from the bank records and were properly disclosed in the other financial records of the Debtor and HTM.

Badge of Fraud 8: The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred

There is insufficient proof to establish this badge of fraud. The Net Balance Chart is simply a running tally of the amount of net cash generated by the Debtor and transferred to HTM in 2002 and 2003 through the bank accounts. Exh. P-9. The Debtor transferred $166 million in cash to HTM during 2002 and 2003 and only received back $125 million in cash, leaving a net cash transfer to HTM of roughly $41 million. These facts are not in dispute and, the Trustee claims, support his allegation that the Debtor did not receive "reasonably equivalent value" through the operation of the cash management system.

The Trustee's expert, Mr. Alexander, opined that the SMTC entities could not possibly have "fed" the Debtor more than it lost. He claimed that the Debtor's losses shown on its financial statements provide the upper limit of the amount that HTM could have funded to the Debtor or on its behalf during any given period. He then calculated the extent of the Debtor's cash loss over a four-year period, and based on those calculations, concluded that the total value received by the Debtor between 2001 and 2004 from HTM was at least $2.5 million but could not have been more than $8.9 million. Exh. P-130.

Mr. Alexander compared two years' of bank statements to four years' of income statements to calculate what he claims were the minimum and maximum amounts of the Debtor's cash loss that could have been funded by its parent. Based on that comparison, according to the Trustee's expert, the Debtor provided the parent with much more value than the Debtor received in return.

The Defendants argue that Mr. Alexander's analysis ignores the intercompany transfers that are not apparent from the bank records and that constitute additional value received by the Debtor. The Trustee asserts that his expert in fact presumed that the Debtor received equivalent value from affiliates for the intercompany transfers. However, according to the Defendants' expert, Mr. Wheeler, that presumption was made only in the portion of Mr. Alexander's analysis that is found in his Sources and Uses of Operational Cash report. *See* Exh. P-7.

Mr. Wheeler argued and the Court agrees that, because when Mr. Alexander analyzed the bank statements he dealt only with revenues from sales, he necessarily could not have taken into account those intercompany transfers that were reflected only in the bank reconciliations and on the general ledger and are accounted for only at the HTM level in the Consolidated ZBA Bank Account. Exh. D-367 and D-368. It was there that the Debtor's "payment" for goods and services received from affiliates was recorded. It was there that the Debtor received "payment" for goods and services it provided to its affiliates. These transactions, reflecting what the subsidiaries bought and sold from each other, were not recorded at each subsidiaries' individual level, but rather show up only as part of the activity in the HTM Consolidated ZBA Account.

This makes sense. For example, the Defendants' contend that the $166 million in sales revenues that were received by the Debtor and swept into the HTM Consolidated ZBA Account were ultimately used to pay the Debtor's expenses. Although the Debtor's bank records reflect it had only $125 million in expenses, that figure, like the $166 million, appears to exclude expenses the Debtor incurred as a result of payments other affiliates made to it or on its behalf. Those payments were not paid by check and so do not appear in the Debtor's bank records, but rather were made by intercompany adjustments at the HTM level. Exh. D-17 and D-18, 10800 ZBA Master Bank Reconciliation (Comerica 5417). Because the evidence presented failed to show the extent of the value provided to the Debtor by those intercompany transfers, the Court finds that the Trustee failed to prove that the Debtor did not receive reasonably equivalent value for its transfers of cash that occurred with the daily sweeps of its accounts.

Finally, the Court is unclear why the extent of value received by the Debtor from the Defendants should be limited to the Debtor's operational losses, as urged by the Trustee. As Mr. Wheeler testified, when Mr. Alexander compared the cash flowing through the bank accounts to the losses of the Debtor, he was "comparing apples to oranges." Overall, the Debtor lost money, that is true, but the extent of that loss should not limit the consideration that the Debtor paid to

69

other parties for goods and services it received, or that it received for goods and services it provided to other affiliates.

The Trustee has not provided the Court a complete picture that explains specifically why reasonably equivalent value was not received. What the ZBA Master Bank Reconciliation demonstrates is that the $41.1 million figure that was derived solely by analyzing the bank accounts does not accurately reflect the payments made to SMTC Mex or to any of the other affiliates on behalf of Debtor via intercompany transfers. The Trustee failed to account for this reconciliation in his explanation as to what effect these transactions would have on reasonably equivalent value. He therefore has not proved the absence of reasonably equivalent value by a preponderance of the evidence.

Badge of Fraud 9: The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred

Yes. The Court has found above that the Debtor was insolvent during the entire period these transfers occurred.

Badge of Fraud 10: The transfer occurred or the obligation was incurred shortly before or shortly after a substantial debt was incurred

No. The Debtor executed the Lease with Flextronics on September 1, 2001, nine months before the start of the Early Wind-Down Period. Exh. D-273. The first transfer listed on Mr. Alexander's Appendix D occurred on January 2, 2002, four months after signing of the Lease. However, Mr. Alexander testified that it was only on or after June 27, 2002-nine months after the execution of the Lease- that he found the cash management system worthy of suspicion. Exh. B. Partial Trial Tr., Testimony of J. Lester Alexander, III, 36:16-17, March 26, 2009; Ex. A, Partial Trial Tr., Testimony of J. Lester Alexander, III, 254: 16-18, March 27, 2009. The Court cannot find that nine months is "shortly after the incurrence of the debt."

Even if it were able to make that finding, other evidence substantially undermines the probative force of this four- or nine-month time span. The cash management system was in place long before the Lease existed. The continuation of this system does not evidence a fraudulent motive. In addition, there is substantial evidence there were legitimate reasons for the cash management system. It facilitated the joint credit-facility, without which the Debtor could not have sustained its operations. Moreover, the system was established at the demand of the Lenders, not the Defendants. Exh. D-37.

70

Badge of Fraud 11: The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor

No.  This badge is inapplicable.

Summary of Badges of Fraud on the Net Balance Transfer

Based on all the foregoing, the Court finds that the Trustee has failed to carry his burden with respect to his allegations involving these cash transfers.

Circumstantial Evidence of Actual Intent:
Badges of Fraud on Claim Category 4: The Fixed Assets Transfers

The Trustee alleges transfers of the Debtor's equipment, furniture, and machinery in March and April 2003 to other SMTC entities, specifically SMTC Chihuahua and SMTC Canada, were fraudulent.  As discussed above, the Court has previously found that on and after March 1, 2003, the Debtor had no "assets" that could have been transferred and so for that reason alone the Fixed Assets Transfers are not avoidable.  However, out of an abundance of caution and for the purpose of completeness, the Court will disregard that and assume for the sake of argument that these were "transfers" of "assets," and address below the other issues affecting their avoidability.

Badge of Fraud 1: Transfers made to insiders or obligations to insiders incurred

Yes.  There is no dispute that the Debtor's fixed assets were transferred to affiliates in Chihuahua and Canada in March and April of 2003.

Badge of Fraud 2: The debtor retained possession or control of the property transferred after the transfer

No.  The Debtor closed its facility.  SMTC Chihuahua and SMTC Canada stored the equipment after transfer.

Badge of Fraud 3: The transfer or obligation was concealed

No.  The Trustee asserts that Paul Walker's statement that SMTC Texas did not have any assets to speak of as of April 2003 established that the Debtor was intentionally concealing assets from Flextronics because the Debtor's balance sheet reflected assets at that time.

In that same email, Mr. Walker expressly told Mr. Carney of Flextronics that any negotiations were constrained "by the bank group" and that even the land the Debtor was offering was "pledged to the bank."  Exh. P-117.  It could be that Mr. Walker thought he was honestly portraying the Debtor as having no assets that it could freely offer Flextronics, because any assets

71

reflected on the balance sheet at that time were encumbered by the lien securing the Lehman Loan. Mr. Walker did not testify, however, so his intentions are not known.

Further, in response to Mr. Walker's email, Mr. Carney recognized the difficulties of electronics manufacturers in Texas and acknowledges that SMTC would have to "draw from resources other than [its] Texas corporation" to attempt to settle the Lease claim. Exh. P-117. Flextronics itself was shutting down operations in Texas and moving manufacturing to Mexico. Exh. D-31. *See also,* Newspaper Articles, *supra.*

Presuming that Flextronics did its due diligence, it was or at least should have been aware of the Lehman Loan and the lenders' security interest because this information was available to the public through UCC-1 filings as well as the SEC 10-K filings. Given this awareness, its own express and documented understanding that electronics manufacturers were not making money in Texas, and its acknowledgment that SMTC Corporate would have to look beyond the Debtor's assets to satisfy the Lease obligation, the Court cannot find that Mr. Walker was somehow concealing assets. Further, at the time the Debtor transferred the fixed assets, other assets remained on the Debtor's books. Exh. D-2, line 324, March and April 2003. Thus, the Court finds that the Trustee did not prove that the transfers were concealed.

Badge of Fraud 4: Before the transfer was made or obligation was incurred, the debtor had been threatened with suit

No. Flextronics did send the Debtor a demand letter on April 2, 2003. There was no evidence, however, that the transfers made by the Debtor after receipt of this letter were motivated by the desire to avoid paying a judgment to Flextronics. In fact, some of the transfers were made before Flextronics sent the demand letter. The evidence suggests that the challenged transfers were made due to the decision to shut down the business. Mr. Sommerville testified this was standard procedure when closing a subsidiary. Further, the value of the fixed assets at transfer was minimal.

Badge of Fraud 5: The transfer was of substantially all the debtor's assets

No. Some of the assets transferred were not the Debtor's, but leased by the Debtor. At most, these were transfers of all the remaining *fixed assets* of the Debtor. Other assets remained on the Debtor's books up until December 2003. Those consisted mainly of accounts receivable and some inventory listed at approximately $13.9 million in March 2003 and $7 million in April 2003. Exh. D-2, line 324. The inventory and receivables appear to have been liquidated because the assets' value decreased each month; however, they were not liquidated all at once but rather

over a period of time, so that no transfer could be said to have been one of "substantially all the debtor's assets."

Badge of Fraud 6: The debtor absconded

No. The Debtor ultimately closed its doors, but not until May of 2003. It then filed bankruptcy in December 2004.

Badge of Fraud 7: The debtor removed or concealed assets

No. See Badge of Fraud 3 above. This was a routine disposition upon closing.

Badge of Fraud 8: The value of the consideration received by the Debtor was reasonably equivalent to the value of the assets transferred or the amount of the obligation incurred

There is insufficient proof this badge existed. The Debtor did not transfer millions of dollars of fixed assets in shutting down. Rather, it transferred only approximately $301,000 worth of assets. The Debtor argues that in exchange for these assets, SMTC Mex and SMTC Canada assumed the Debtor's portion of the Lehman Loan. As of March 2003, the book value of the Debtor's fixed assets was approximately $5,386,000.00. Exh. D-233, Resp SMTC 53674, Texas Fixed Asset Continuity. Of this amount, leasehold improvements made up approximately $2,672,000.00. Id. These leasehold improvements were not transferred, but abandoned back to Flextronics and should therefore be deducted from any transferred assets. The Bratton Lane land was not transferred (it was later included in the Debtor's bankruptcy estate), and its book value of approximately $522,000.00 should also be deducted. Id. This leaves a net book value of approximately $2,192,000.00 in fixed assets that could have been transferred. As demonstrated by Exh. P-124 and the testimony of Mr. Desai, however, the market value of the assets actually owned by the Debtor and transferred was approximately $301,000.00, which is substantially less than the book value. Exh. P-124.

The testimony of Mr. Sommerfield, Mr. Hartstein and Mr. Kingery is inconclusive as to what, if any, assets owned by the Debtor were actually transferred to SMTC Chihuahua and SMTC Canada and in no way provided the Court with the actual value of the assets at the time they were transferred. Testimony of the value of assets when they are purchased is totally irrelevant to the asset value upon transfer unless purchased and transferred contemporaneously. This did not happen. Likewise the outdated personal property tax appraisal reflecting furniture, fixtures and equipment valued as of January 29, 2002 of $4,212,334 is totally irrelevant to the value at the time the fixed assets were transferred to subsidiaries in March and April of 2003. The

73

Trustee failed to provide an accurate value of the fixed assets upon transfer and therefore fails in his burden to prove no reasonably equivalent value.

With respect to the other side of the equation–the value the Debtor received for the assets it transferred–the Defendants argue that the Debtor's sister companies' assumption of its portion of Lehman Loan, evidenced by the subsequent restructuring and refinancing of the debt done by them without the Debtor's participation, constitutes reasonably equivalent value for the transfer. Exh. D-110. Because the Trustee bore the burden of proof with respect to this issue, and the Court finds he failed to present adequate proof to meet that burden, the Defendants' contentions need not be addressed and the Court declines to do so.

Badge of Fraud 9: The debtor was insolvent or became insolvent shortly after the transfer occurred or the obligation was incurred

Yes. The Court has found, above, that the Debtor was insolvent as early as January of 2002, and at all relevant times thereafter. These transfers were made in March and April of 2003.

Badge of Fraud 10: The transfer occurred shortly after a substantial debt was incurred

No. The Debtor became liable on the Lehman Loan back in 2000, and executed the Flextronics Lease in September of 2001. The transfers occurred in March and April of 2003, a year and a half after the Lease date. There was no evidence of any other "substantial debt" that the Debtor incurred before these transfers.

Badge of Fraud 11: The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor

No. This badge is not applicable.

Summary of Badges of Fraud on Fixed Assets Transfers

Because the Trustee proved only two badges of fraud–transfers to insiders and insolvency–with respect to the Fixed Assets Transfers, the Court finds he failed to provide sufficient circumstantial evidence that those transfers were made with actual intent to hinder, delay, or defraud the Debtor's creditors.

### Conclusions Regarding the Trustee's Claims for Transfers Made with Actual Intent to Hinder, Delay or Defraud

The totality of the circumstantial evidence for each type of transfer is insufficient to support an inference of fraudulent intent. Therefore, the Trustee has failed to establish fraudulent intent by a preponderance of the evidence, and Defendants are entitled to judgment denying the Trustee's § 24.005(a)(1) claims.

## **The Trustee's Claims for Transfers Made with Constructive Fraud**

To establish constructive fraud, the Trustee must prove the following elements for each transaction under § 24.005(a)(2) of TUFTA:

1) that the transactions constituted a transfer;

2) that the debtor received less than reasonably equivalent value in exchange for the transfer; and

3) one of the following:

> (i) that the debtor was insolvent at the time of the transfer or as a result of the transfer;

> (ii) that the debtor was left with unreasonably small capital after the transfer; or

> (iii) that at the time of the transfer debtor intended to incur debts beyond its ability to pay.

*Weaver v. Kellogg,* 216 B.R. 563, 573 (S.D. Tex. 1997).

In order to prevail under § 24.006(a) of TUFTA, the Trustee must prove the following elements for each transaction:

1) that the transaction constituted a transfer;

2) that debtor received less than reasonably equivalent value in exchange for the transfer; and that debtor was insolvent at the time of the transfer or as a result of the transfer.

*Id.*

Thus, the three elements the Trustee must have proven with respect to each transfer are that there was a transfer, that no reasonably equivalent value was received by the Debtor for that transfer, and that the Debtor was insolvent when that transfer occurred.


### Constructive Fraud Elements as to Claim Category 1: The Intercompany Transfers

As discussed above, the Court has previously rejected the Defendants' argument that the Debtor had no "assets" that could have been transferred at the time of the Intercompany Transfers, and so finds the Trustee established that "transfers" occurred. The Court has also previously found that the Debtor was insolvent during the entire period during which these transfers in question took place.

As discussed above in connection with the Court's review of the circumstantial evidence (badges of fraud) of actual intent with respect to these transfers, the Court has previously found

that reasonably equivalent value for the transfers *was* given, and for that reason finds that the Trustee has failed to prove constructive fraud with respect to the Intercompany Transfers.

Out of an abundance of caution and in the interest of completeness, however, the Court will address the issue of whether Debtor "was left with unreasonably small capital after the transfer or . . . at the time of the transfer . . . intended to incur debts beyond its ability to pay," an alternative to the insolvency element.

There was no evidence that at the time of these transfers that the Debtor intended to incur debts beyond its ability to pay. The Debtor was shutting down. Mr. Alexander did testify that the Debtor was undercapitalized in his view, based on the operation of the cash management system. The Trustee claims that because of this system, the Debtor was not able to accumulate any cash. Any time it needed to pay an expense, it was required to obtain consent from HTM or SMTC Corporate, a procedure which provided these entities with absolute power and prevented the Debtor from operating as a stand-alone entity.

The Defendants, on the other hand, claim that the Debtor's operations were adequately capitalized by virtue of the Lehman Loan joint credit facility. Because the extent of the credit granted by Lehman was limited by the consolidated assets of all the SMTC entities, the SMTC subsidiaries (including the Debtor) had to apportion the access to credit to fund its operations. *See* Exh. D-35, the Credit Agreement. As Mr. Hartstein and Ms. Markland testified, however, even if payment was delayed, SMTC Texas was never denied the funds needed to pay its vendors even after shutting down as reflected in the fact that only seven proofs of claim were filed in the Debtor's bankruptcy case.

The fact that the Debtor was never permitted to accumulate cash does not mean it was undercapitalized. The reason SMTC Texas did not accumulate cash was that it was not profitable enough to pay off the financing it needed to start and maintain its operations. This fact is evidenced by the Lehman Loan balance which remained on SMTC Texas's financial statements. Exh. D-2, line 342.

The Trustee has failed in his burden of proof with respect to the Intercompany Transfers. The evidence that was offered by the Defendants established that these transfers were made in the ordinary course of business, that they were made due to a legitimate business purpose, and that they were accurately documented on the books and records and other financial reports of the affected subsidiaries and other SMTC entities. The Court finds and concludes that there was no

76

fraudulent conveyance under TUFTA § 24.005(a)(2) or under § 24.006(a) with respect to the $37 million Intercompany Transfers.

### Constructive Fraud Elements as to Claim Category 2: The Expense Reallocations

The Expense Reallocations were obligations incurred by the Debtor, and so the requirement that there was a transfer of an asset or an obligation incurred is satisfied. The Court has previously found that the Debtor was insolvent during the period during which the Expense Reallocations took place.

However, as discussed above in connection with the Court's review of the circumstantial evidence (badges of fraud) of actual intent with respect to the Expense Reallocations, it has previously found that the Trustee failed to prove that the Debtor did not receive reasonably equivalent value for the incurrence of these obligations. Rather, the Defendants offered substantial evidence that the reallocated costs were assessed against the Debtor for legitimate business purposes and that the Debtor received reasonably equivalent value for them.

With respect to the issue of whether, at the time of or after the obligation was incurred, the Debtor was left with unreasonably small capital or intended to incur debts beyond its ability to pay (the alternative to the insolvency element), the Court's findings and conclusions above with respect to constructive fraud and the Intercompany Transfers apply as well to the Expense Reallocations. Therefore, the Court finds that the Trustee failed to meet his burden of proof on this issue with respect to the Expense Reallocations, as well.

In summary, the Trustee failed to prove the Expense Reallocations were obligations fraudulently incurred within the meaning of either TUFTA § 24.005(a)(2) or § 24.006(a).

### Constructive Fraud Elements as to Claim Category 3: The Net Balance Transfer

The Court has previously found that on and after March 1, 2003, the Debtor had no "assets" that could have been transferred and so for that reason the Net Balance Transfer transactions that occurred during that period ($3.9 million) are not avoidable "transfers" under either TUFTA § 24.005(a)(2) or § 24.006(a).

With respect to reasonably equivalent value, the Court finds that the Trustee failed to carry his burden as his evidence failed to take into consideration the reconciliations made for the

intercompany payables and receivables that were handled at the HTM level and their effect on the value given.

The Court has previously found the Debtor was insolvent during the entire period during which the Net Balance Transfer occurred. Further, the Court finds that the Trustee failed to prove that the Debtor was left with unreasonably small capital after the Net Balance Transfer or, at the time of the Net Balance Transfer, intended to incur debts beyond its ability to pay. On the contrary, as discussed above, the Defendants established that the cash management system had been operating since 2000 when the loan facility was put in place and was required by Lehman, that the Debtor's cash management transactions were well-documented through the bank records and/or its internal financial records, and that all company expenses incurred prior to the Debtor surrendering the Lease were paid except for certain tax payments, a few small unsecured claims, and future payments due under the Lease.

In summary, the Trustee failed to prove the $41.1 million Net Balance Transfer was a fraudulent transfer within the meaning of either TUFTA § 24.005(a)(2) or § 24.006(a).

### Constructive Fraud Elements as to Claim Category 4: The Fixed Assets Transfers

The Court has previously found that on and after March 1, 2003, the Debtor had no "assets" that could have been transferred and so for that reason the Debtor's conveyances of its capital assets in March and April of 2003 are not avoidable "transfers" under either TUFTA § 24.005(a)(2) or § 24.006(a).

In addition, while the Court has previously found that these transfers were made while the Debtor was insolvent, for the reasons stated above it does not find that the Debtor was left with unreasonably small capital after these transfers or that at the time of these transfers it intended to incur debts beyond its ability to pay.

Finally, the Court finds that the Trustee failed to provide sufficient competent evidence regarding wether the Debtor received reasonably equivalent value with respect to these transfers. Rather, it was the Defendants which ultimately introduced the equipment list prepared by B.J. Desai, and called him as a witness, the only competent evidence on the issue.

In summary, the Court finds that the Trustee failed to prove the Fixed Assets Transfers were fraudulent conveyances under either TUFTA § 24.005(a)(2) or § 24.006(a).

### The Trustee's Veil Piercing Claims

The Trustee asserted veil-piercing claims against SMTC Corporate, HTM and SMTC Canada.  As explained by the Texas Supreme Court in *Lucas v. Texas Industries, Inc.,* 696 S.W.2d 372 (Tex. 1984):

> Generally, a court will not disregard the corporate fiction and hold a corporation liable for the obligations of its subsidiary except where it appears the corporate entity of the subsidiary is being used as a sham to perpetrate a fraud, to avoid liability, to avoid the effect of a statute, or in other exceptional circumstances. There must be something more than mere unity of financial interest, ownership and control for a court to treat the subsidiary as the *alter ego* of the parent and make the parent liable for the subsidiary's tort.  The corporate entity of the subsidiary must have been used to "bring about results which are condemned by the general statements of public policy which are enunciated by the courts as 'rules' which determine whether the courts will recognize their own child."  The plaintiff must prove that he has fallen victim to a basically unfair device by which a corporate entity has been used to achieve an inequitable result.

*Id.* at 374 (citations omitted).

Additionally, as stated by the Texas Supreme Court in *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex. 1986), *superseded on other grounds* by Tex. Bus. Corp. Act. Ann. art. 2.21A:

> Alter ego applies when there is such a unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice.  It is shown from the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation and whether the corporation has been used for personal purposes.  Alter ego's rationale is: "if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors."

*Id.* at 272 (citations omitted).

Since 1993, Article 2.21 has provided the exclusive grounds for imposing liability on a corporation for the obligations of another corporation with which it is affiliated.  *See* Tex. Bus. Corp. Act art. 2.21(B); *SSP Partners v. Gladstrong Investments (USA) Corporation,* 275 S.W.3d 444 (Tex. 2008).  This statute was enacted and amended several times, largely in response to the Texas Supreme Court's decision in *Castleberry* to clarify and restrict the circumstances under which the corporate form could be disregarded.  *See Menetti v. Chavers,* 974 S.W.2d 168, 173-74 (Tex. App.–San Antonio 1998, no pet.).  The relevant portions of the statute provide:

79

A.  A holder of shares . . . or any affiliate thereof or of the corporation shall be
under no obligation to the corporation or to its obligees with respect to:

. . .

(2) any contractual obligation of the corporation or any matter relating to or arising
from the obligation on the basis that the holder, owner, subscriber, or affiliate is or
was the alter ego of the corporation, or on the basis of actual fraud or constructive
fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee
demonstrates that the holder, owner, subscriber or affiliate caused the corporation
to be used for the purpose of perpetrating and did perpetrate an actual fraud on the
obligee primarily for the direct personal benefit of the holder, owner, subscriber, or
affiliate.

. . .

> B.  The liability of a holder, owner, or subscriber of shares of a corporation
> or any affiliate thereof or of the corporation for an obligation that is limited
> by Section A of this article is exclusive and preempts any other liability
> imposed on a holder, owner, or subscriber of shares of a corporation or any
> affiliate thereof or of the corporation for that obligation under common law
> or otherwise. . . .

Tex. Bus. Corp. Act art. 2.21(B).

The Trustee has an obligation to show that each of SMTC Corporate, HTM, and SMTC
Canada was guilty of (1) causing the Debtor to be used for the purpose of perpetrating an "actual
fraud" on the Debtor's creditors relating to the Flextronics Lease, (2) committing "actual fraud"
with respect to the Flextronics Lease, and (3) doing so "primarily" for its own "direct personal
benefit." *Id.*; *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.,* 237 S.W.3d. 379,
387 (Tex. App.–Houston [14th Dist.] 2007, no pet.).

The Trustee provided insufficient evidence that each of these Defendants engaged in the
requisite conduct or acted with the necessary intent.  Without specific proof as to each of these
Defendants on each of the three factors, the Trustee cannot use veil-piercing to impose liability
against those entities, and judgment against the Trustee should be rendered accordingly.
Specifically, the Trustee failed in his burden under each of the theories he urged, for the following
reasons.

<u>The Trustee's Veil-Piercing Claim Based on Alter Ego</u>

"Alter ego properly focuses upon the relationship between the corporation and its owners
and not upon the relationship between the corporation and the claimant-creditor." *Gibralter
Savings v. LD Brinkman*, 860 F.2d 1275 (5th Cir. 1988).  A variety of factors must be evaluated
to determine whether "management and operations are assimilated to the extent that the

80

subsidiary" is nothing more than a mere adjunct of the parent. *Edwards Co., Inc. v. Monogram Industries, Inc.,* 700 F.2d 994 (5th Cir. 1983). Texas courts are loathe to merge the separate legal identities of parent and subsidiary unless the latter exists as a mere tool or "front" for the parent, or the corporate fiction is utilized to achieve an inequitable result, or to conceal fraud or illegality. *Id.; Gentry v. Credit Plan Corp. of Houston,* 528 S.W. 2d 571 (Tex. 1975). Texas courts have been less reluctant to disregard the integrity of related corporations in tort cases, as opposed to contract cases. This different treatment can be attributed in major part to the element of choice inherent in a contractual relationship. *Texas Indus., Inc. v. Lucas,* 634 S.W.2d 748 (Tex. Civ. App.–Houston 1982), *rev'd on other grounds,* 696 S.W.2d 372 (Tex. 1984); *Hanson Southwest Corp. v. Dal-Mac Constr. Co.,* 554 S.W. 2d 712 (Tex. Civ. App.–Dallas 1977, *writ ref'd n.r.e.*).

Although the attitude toward judicial piercing of the corporate veil is more flexible in tort, the legal precepts governing both tort and contract suits are substantially the same. *Hanson Southwest Corp.,* 554 S.W. 2d 712. Proof of an identity of shareholders or of corporate directors and officers or of domination by the parent of its subsidiary's affairs will not alone justify treatment of the two as one business unit. *Gentry,* 528 S.W.2d 571. Nor does the parent's ownership of 100% of the subsidiary's stock alone defeat their separate existence. *Edwards Co., Inc.,* 700 F.2d. 994.

Rather, one must look to the total dealings of the corporation and the parent/shareholder relationship, including:

1. the parent and subsidiary have common stock ownership,

2. common directors or officers,

3. the parent and subsidiary have common business departments,

4. the parent and subsidiary file consolidated financial statements,

5. the parent finances the subsidiary,

6. the parent caused the incorporation of the subsidiary,

7. the subsidiary operated with grossly inadequate capital,

8. the parent pays salaries and other expenses of subsidiary,

9. the subsidiary receives no business except that given by the parent,

10. the parent uses the subsidiary's property as its own,

11. the daily operations of the two corporations are not kept separate, and

12. the subsidiary does not observe corporate formalities.

*United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686 (5th Cir. 1985), *cert. denied*, 475 U.S. 1014 (1986).

The Trustee claims that SMTC Corporate, led by Paul Walker, controlled all aspects of the Debtor including making its day-to-day operating decisions with respect to its vendors and customers. Mr. Hartstein was apparently almost fired by Paul Walker when Mr. Hartstein attempted to negotiate payment terms for one of the Debtor's customers. The Trustee argues that the Debtor had to receive permission from SMTC Corporate before acting and/or that SMTC Corporate acted for the Debtor in at least certain key instances, such as making the decision for the Debtor to disengage from Dell and close. In addition, he claims his alter ego theory is further supported by the facts that the Debtor operated with no cash and was therefore dependent on SMTC Canada and HTM to fund it so that it could pay its expenses.

The Trustee asserts that this is sufficient evidence to find SMTC Corporate, HTM, and SMTC Canada liable on his alter ego claim. The resolution of alter ego issues must be based on a consideration of "the totality of the circumstances"; there is "no litmus test." *Id.* at 694. Accordingly, although the facts stated above may be relevant to a totality of the circumstances inquiry, they are not dispositive. Even if all were found to be applicable, other circumstances might justify a refusal to pierce the corporate veil.

SMTC Corporate established the Debtor as an operating subsidiary in 1996. SMTC Corporate, HTM, and the other SMTC entities did have common stock ownership with each other, and there were common directors and officers. The entities filed consolidated financial statements. All of the entities' operations were financed by the Lehman Loan and the processing for this Loan was centrally managed by HTM. That meant the Debtor did not operate with cash, and HTM disbursed the funds to the Debtor to enable it to pay its monthly expenses. This procedure is not equivalent, however, to the Debtor's not having paid those monthly expenses. Rather, the Debtor's requests for funds from HTM/SMTC Canada to pay its monthly expenses were routinely granted (although not always in a timely manner, depending upon the outstanding Lehman Loan balance and the cash needs of the other subsidiaries).

SMTC Corporate helped the Debtor locate customers, but testimony indicated that the Debtor itself also did some of its own marketing. The Debtor owned its own property–it held title to the land that the Trustee eventually sold in its bankruptcy case. SMTC Corporate, HTM, and SMTC Canada each had a separate business site from the Debtor.

There were no corporate minute books produced at trial so the Court does not know whether the Debtor observed all corporate formalities throughout the years of its existence. Cliff Ernst testified that he incorporated the Debtor. P-120. In 2000, Mr. Ernst opined that the Debtor was in good standing as a duly existing corporation. D-349. The Defendants produced several corporate documents also relevant to the Debtor's corporate existence and good standing. *See* Exhs. D-350 through D-353. The Debtor maintained separate bank accounts in connection with its operations, it had a separate accounting department from SMTC Corporate, HTM, and SMTC Canada, and the Debtor's accounting department paid its expenses and payroll and kept its own financial records and ledgers. It had a general manager, an on-site controller, and many other employees. The Debtor operated independently in Texas since 1996. It executed the Lease with Flextronics and operated in that building from September 2001 until May 2003, when it ultimately shut down.

Further, this is an alter ego claim based on a contract, not on a tort theory of liability. "In contract cases, fraud is an essential element of an alter ego finding." *Jon-T*, 768 F.2d at 692. In a contract case, the creditor has willingly transacted business with the subsidiary. If the creditor wants to be able to hold the parent liable for the subsidiary's debts, it can contract for this protection. Unless the subsidiary misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the subsidiary; it should not be able to complain later that the subsidiary is unsound. *Id.* at 693. Moreover,

> where a party has contracted with a corporation and is sued upon the contract, neither is permitted to deny the existence or the legal validity of such corporation. To hold otherwise would be contrary to the plainest principles of reason and of good faith, and involve a mockery of justice. Parties must take the consequences of the position they assume.

*Casey v. Galli*, 94 U.S. 673, 680 (1876).

Flextronics entered into the Lease with the Debtor on September 1, 2001. This was a contractual relationship. Flextronics was a highly sophisticated business entity with subsidiaries and related entities operating worldwide, much like the Debtor was. There is no evidence in the record that the Debtor misrepresented its financial condition to Flextronics when it entered into the Lease. On the contrary, there is substantial evidence that Flextronics monitored the Debtor's financials to such an extent that it became concerned about its operations and ultimately requested a parental guaranty of the Debtor's Lease obligations. That request, however, was made too late.

The weight of the evidence shows that it was the downturn in the computer industry that actually led to the demise of the Debtor and the Debtor's decision to shut down. The Debtor was a subsidiary of a multinational corporation. The fact that SMTC Corporate, HTM, and SMTC Canada aided the Debtor in its operations and authorized certain of its actions and operations, considered with all other relevant facts and circumstances, is not sufficient to pierce the corporate veil under an alter ego theory. The Trustee failed to prove that any of the particular instances in which SMTC Corporate personnel acted on behalf of the Debtor or required acts on the Debtor's part constituted an abuse of its corporate identity. To obtain economies of scale, multinational corporations often provide services to their subsidiaries such as obtaining financing and providing information technology, accounting, engineering, marketing, and other services. This in turn requires some exercise of control/leadership by the parent in connection with its subsidiary. Such leadership and guidance does not mean that the subsidiary is operating in such a manner that it does not maintain a separate existence.

Based on the evidence that was offered, the Court cannot find that the Debtor completely disregarded corporate formalities. Efforts were made to keep records of intercompany transactions, separate bank accounts were maintained, property and assets were not indiscriminately commingled, and there were differences in the business activities and offices of SMTC Corporate, HTM, SMTC Canada, and the Debtor.

In summary, the Court is persuaded that under these facts the Debtor's operations were sufficiently independent of the control of SMTC Corporate, HTM, and SMTC Canada to preclude a judicial piercing of the corporate veil for purposes of alter ego. The Court thus concludes that the Trustee has failed in his proof of his alter ego claim.

### The Trustee's Veil-Piercing Claim Based on Sham to Perpetrate a Fraud

The Trustee's argues that the arrangement between the Debtor and SMTC Corporate that governed the Debtor's financial operations was merely a sham to siphon money away from the Debtor, leaving it an empty shell with no assets for its creditors. Because the Debtor did not exist or operate as a separate legal entity, he claims, having the Debtor maintain a separate legal existence was merely a sham to perpetrate a fraud on the Debtor's creditors.

This doctrine is typically applied where the controlling entity siphons off revenue and sells off much of the other entity's assets or does other acts to hinder the on-going business and the

ability of the corporation to pay off its debts. *See In re JNS Aviation, LLC*, 376 B.R. 500, 529

(Bankr. N.D. Tex 2007) (citing *Castleberry v. Branscum*, 721 S.W. 2d 270, 273 (Tex 1986)).  As

explained by the Fifth Circuit Court of Appeals in *Fidelity & Deposit Co. v. Casualty*

*Consultants, Inc.*, 976 F.2d 272 (5th Cir. 1992):

> The focus under the sham to perpetrate a fraud theory is on "injustice or unfairness
> to the *claimant* caused by the corporation and its owners."  For a claimant to
> establish such unfairness, he must ordinarily demonstrate that he relied on the
> financial backing of the owners.  "Without reliance, the contract claimant cannot
> avoid the risk of insolvency that it originally accepted as part of the bargain."

*Id.* at 275 (citations omitted).  In spite of the apparent broadness of this equitable doctrine, the

Court remains mindful that, "[n]ormally, the corporation is an insulator from liability on claims of

creditors [and t]he fact that incorporation was desired in order to obtain limited liability does not

defeat that purpose." *Anderson v. Abbott*, 321 U.S. 349 (1944).

The Trustee claims that the evidence clearly establishes the Defendants' "dishonesty of

purpose" and "intent to deceive" as required by Article 2.21 of the Texas Business Corporation

Act.  As evidence of such purpose, he points to Mr. Woodard's email of May 31, 2002, which

discusses the option of bankrupting the Debtor and "walking away from the lease," as well as

Mr. Sommerville's email, written after the Debtor defaulted on the Lease, in which Sommerville

describes a visit to the Debtor's plant by a Flextronics employee and reassures Mr. Walker that the

facility appeared to be staffed during the visit so that it was "not obvious we are exiting next

month." Exhs. P-82, P-87.

Further evidence of a sham, the Trustee claims, is Mr. Walker's response to Flextronics's

demand letter, in which he describes the Debtor as a "stand alone entity [that] doesn't have any

assets to speak of."  The Trustee argues that Mr. Walker used the Debtor's separate corporate

existence as a shield behind which he was able to hide the truth–that the Debtor had $15 million

in assets, still had cash and, contrary to the email, had not been operated as a "stand alone entity"

for the ten preceding months.  This, claims the Trustee, benefitted SMTC Corporate, HTM, and

SMTC Canada, which were then able to siphon off all of the Debtor's remaining assets without

paying any more on the Lease.

The Trustee claims that after the Lease default in March 2003, all cash flowing into the

Debtor's account was siphoned to HTM and none was redirected to the Debtor to make the Lease

payments.  The Debtor requisitioned the March rent payment but was denied funding by the

corporate offices.  The Debtor then transferred all of its manufacturing equipment in March and

April of 2003, and all of the accounts receivable and other assets were liquidated by the end of 2003. The Trustee argues that this evidence is sufficient to show that the siphoning of the cash and transfer of other assets with no notice to Flextronics amounted to a "sham to perpetrate a fraud" on Flextronics.

Even assuming that were true, the reliance component must also be met. ***Pace Corp. v. Jackson***, 155 Tex. 179, 190, 284 S.W.2d 340, 351 (1955) ("Respondent was as well acquainted with the financial structure of Pace Corporation as were [the individual owners]."); ***Hanson Southwest Corp. v. Dal-Mac Constr. Co.***, 554 S.W.2d 712, 718 (Tex. Civ. App.-Dallas 1977, *writ ref'd n.r.e.*) ("[Entering voluntarily] into the contract [though] realizing that it [the 'shell'] might not be financially sound and despite fruitless efforts to obtain a guarantee from the parent company [plaintiff construction company cannot now pierce the corporate veil]."); and ***Paine v. Carter***, 469 S.W.2d 822, 827 (Tex. Civ. App.–Houston [14[th] Dist.] 1971, *writ ref'd n.r.e.*) ("[T]he contract recognizes and assumes the separate existence of [the companies]. [The other party to the contract having chosen] to deal with both . . . in their separate legal capacities," such party "is estopped to claim that the corporation is the alter ego of the individual (or the reverse thereof)."). There is no evidence that Flextronics relied on the financial backing of the Debtor's owners, HTM and SMTC Corporate, and its affiliate SMTC Canada, in deciding to do business with the Debtor. Where a party knows of the relationship between a corporation and its shareholder and chooses freely and voluntarily to deal with them in their respective capacities, he is estopped to claim that the corporate form should be ignored. ***Atomic Fuel Extraction Corp. v. Estate of Tom Slick***, 386 S.W.2d 180, 191 (Tex. Civ. App.–San Antonio 1964, *writ ref'd n.r.e*) ("Atomic, with full knowledge, chose to deal with and continue to deal with the corporations to the exclusion of [the owner].").

The evidence establishes that Flextronics had the ability to review certain financial data from the Debtor to evaluate if its position was secure with respect to the Debtor's operations. It is apparent from the evidence that Flextronics was in the process of requesting a parental guaranty from SMTC Corporate when the Debtor closed its doors, a sign Flextronics was concerned about the Debtor's financial situation. Flextronics was a sophisticated company and could have requested a guaranty when it entered into the Lease. It accepted the risk of only dealing with a subsidiary when it dealt solely with the Debtor. Given the evidentiary record, the Trustee again fails to sustain his burden of proof. The sham to perpetrate a fraud claim should be denied.

## CONCLUSION

The Trustee's overarching contention in this case has been that the Debtor attempted to defraud Flextronics when it walked away from Lease because it had no legitimate reason to do so. All of the witnesses were credible and their testimony, considered individually or as a whole, does not lead the Court to that conclusion. On the contrary, the evidence established that the default was as a result of the Debtor's financial difficulty caused by the downturn in the technology sector in the early to mid-2000s. *See* Newspaper Articles, *supra*. Mr. Hartstein spoke frankly about how burdensome the Lease was once it became obvious that the Debtor was losing customers. Moreover, numerous witnesses, including Mr. Hartstein and the Trustee's expert, testified that the Debtor was operating at a loss, was unprofitable, and did not have the business to generate income to sustain operations in Austin. Thus, the fact that the Debtor defaulted on the Lease is not evidence of any fraudulent intent of the Debtor to transfer assets to remove them from Flextronics's reach. Nor does it transform the common, legitimate, and (in this case) lender-instituted and -maintained cash management system into a devious means of siphoning income away from the Debtor.

Flextronics took a risk in leasing the property to the Debtor considering the bursting of the tech bubble the year before, and without obtaining a parental guarantee. Flextronics, through the Trustee, is attempting to circumvent the risk it voluntarily assumed and avoid the resulting but not unforeseeable damages resulting from a downturn in the technology sector of the economy . As the Court in *Jon-T Chemicals, Inc.*, 768 F.2d at 693, noted:

> [T]he creditor has willingly transacted business with the subsidiary. If the creditor wants to be able to hold the parent liable for the subsidiary's debts, it can contract for this. Unless the subsidiary misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the subsidiary; it should not be able to complain later that the subsidiary is unsound.

In summary, the Court has found and concluded that the conveyances that occurred after March 1 of 2003 were not "transfers" withing the meaning of TUFTA and for that reason cannot be avoided under that statute. It also has found that the Debtor did not defraud Flextronics. Further, SMTC Corporate, SMTC Canada, and HTM were not the alter egos of the Debtor. Finally, there was no evidence that when Flextronics entered into the Lease, it relied on the financial backing of SMTC Corporate or any other SMTC entity to ensure it would be made whole in the event of the Debtor's default. The Trustee has not proven that Flextronics relied on the Debtor's owner to support a claim for sham to perpetuate a fraud.

Consistent with these findings of fact and conclusions of law, as well as those previously stated with respect to the Defendants' pre-trial dispositive motions, the Court will grant the Defendants' Rule 52(c) Motion and enter a take nothing judgment against the Trustee.

# # #